IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 14-cv-03282-RBJ

BRUCE MINGO,

      Applicant,

v.

RICK RAEMISCH, Executive Director, Colorado Department of Corrections, and
CYNTHIA COFFMAN, The Attorney General of the State of Colorado,

      Respondents.

---

## ORDER DENYING APPLICATION FOR A WRIT OF HABEAS CORPUS

---

The matter before the Court is an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, ECF No. 1. After reviewing the pertinent portions of the record in this case, including the Application, Answer, ECF No. 28, and Reply, ECF No. 37, the Court determines it can resolve the Application without a hearing, *see* 28 U.S.C. § 2254(e)(2); Fed. R. Governing Section 2254 Cases 8(a), and concludes that the action should be dismissed.

## I.  BACKGROUND

Applicant is a prisoner in the custody of the Colorado Department of Corrections. He currently is incarcerated at the Arkansas Valley Correctional Facility in Ordway, Colorado. The Colorado Court of Appeals (CCA), in the denial of Applicant's direct appeal, summarized the underlying facts as follows.

> Early one morning defendant and two co-defendants visited the apartment of his accomplice. While standing on his balcony, the accomplice saw a taxi back into his car in the parking lot below. He went downstairs to see the damage and began to argue with the taxi driver, the victim. Defendant and the two co-defendants joined the accomplice downstairs, and the four of them beat the victim to death.

1

Defendant and the two friends drove away in the accomplice's car.   The accomplice was later arrested.   Several days later, defendant voluntarily turned himself in to the police when he learned a warrant had been issued for his arrest.

The accomplice eventually entered into a plea bargain, pleading guilty to attempted second-degree murder and agreeing to testify at defendant's trial and the trials of the co-defendants.   Defendant was convicted after a jury trial at which the accomplice testified . . . .

*People of the State of Colo. v. Mingo*, No. 99CA0882, 1 (Colo. App. Dec. 7, 2000); ECF No. 10-2

at 2.   In the CCA's denial of Applicant's postconviction appeal, the court summarized the

criminal case proceedings as follows.

The jury convicted defendant of first degree murder and the court sentenced him to life without parole.   Defendant appealed his conviction to [the CCA], asserting, among other things, that the trial court had committed plain error by failing to instruct the jury on the unreliability of uncorroborated testimony of an accomplice and that the court had denied his right to a fair trial by giving a complicity instruction.   A division of [the CCA] rejected those contentions and affirmed defendant's conviction.   *People v. Mingo*, (Colo. App. No. 99CA0882, Dec. 7, 2000) (not published pursuant to C.A.R. 35(f) (*Mingo I*).

Defendant subsequently filed the Crim. P. 35(c) motion for postconviction relief at issue here, and later filed two supplements and one addendum following his trial counsel's death.   After several hearings that included expert testimony and testimony by both Williams and O'Neal [two co-defendants] purporting to exonerate defendant, the postconviction court issued an order denying relief.

*People of the State of Colo. v. Mingo*, No. 10CA2150, 7-8 (Colo. App. Nov. 14, 2013); ECF No.

10-3 at 8-9.   The CCA confirmed the postconviction court's denial of Applicant's Colo. Crim. P.

35(c) motion.   *Id.* at 58.   Applicant was convicted by a trial jury of first degree murder and was

sentenced to life without parole in Colorado Criminal Case No. 98CR2673.   ECF No. 1 at 2;

Prelim. Resp., ECF No. 10-1 (State Reg.), at 2.

## II.  HABEAS CLAIMS

Applicant, acting *pro se*, filed this Application on December 3, 2014.   He asserts four

claims in the Application as follows.

(1)   Trial counsel violated Applicant's right to effective assistance of counsel by:

      (i) Conceding prosecution's theory of guilt in opening and closing statements;

      (ii) Eliciting incorrect forensic evidence falsely inculpating Applicant;

      (iii) Not offering a coherent defense theory;

      (iv) Failing to present defenses heard in co-defendants' trial and expert testimony regarding who attacked the victim;

      (v) Failing to investigate and present testimony from co-defendants that Applicant did not participate in beating victim;

      (vi) Failing to object and waiving Applicant's right to confront co-defendant on his lighter sentence for testifying;

      (vii) Failing to assure the jury was properly instructed; and

      (viii) Interfering with Applicant's right to testify;

(2)   Postconviction court violated Applicant's due process rights when the court rejected significant material evidence;

(3)   Trial court violated Applicant's due process rights when the court offered sentencing inducements to the prosecution's chief witness to testify against Applicant; and

(4)   Trial court violated Applicant's due process rights by failing to give him a complete and accurate advisement regarding his right to trial and counsel interfered with Applicant's right to testify.

      On December 4, 2014, Magistrate Judge Gordon P. Gallagher entered an order directing

Respondents to file a Pre-Answer Response and address the affirmative defenses of

timeliness under 28 U.S.C. § 2244(d) and exhaustion of state court remedies under

28 U.S.C. § 2254(b)(1)(A) if Respondents intended to raise either or both of these

defenses.   Respondents filed a Pre-Answer Response, ECF No. 10, on January 21, 2015.

Applicant did not file a Reply.   Respondents concede in the Pre-Answer Response that the

Application is timely and Claims One and Three are exhausted, but they argue that Claim Two is not cognizable in a federal habeas action and Claim Four is unexhausted.

This Court reviewed the Application and Pre-Answer Response and determined that Claim Two is not cognizable in a federal habeas action, but found Claim Four is exhausted pursuant to Colo. App. R. 51.1(a).   Respondents then were directed to file an answer in compliance with Rule 5 of the Rules Governing Section 2254 Cases that fully addresses the merits of Claims One, Three, and Four, which they did on June 4, 2015.   Applicant filed a Reply on October 19, 2015.

**A.   Pro Se Standard of Review**

Applicant is proceeding *pro se*.   The Court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (pro se complaint held   to less stringent standards than formal pleadings drafted by lawyers).   However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."   *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).   A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged.   *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

**B.   28 U.S.C. § 2254**

Section 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court, unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question pursuant to § 2254(d)(1) is whether Applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). The "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Finality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from this Court has become time barred or has been disposed of." *Greene v. Fisher*, — U. S. —, 132 S. Ct. 38, 44 (2011) (citing *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1). *See id.* at 1018. If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405, 120 S. Ct. 1495). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405, 120 S. Ct. 1495 (citation omitted).

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08, 120 S. Ct. 1495. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply. *Carter* [*v. Ward*, 347 F3d. 860, 864 (10th Cir. 2003)] (quoting *Valdez* [*v. Ward*, 219 F.3d 1222, 1229-30 10th Cir. 2000]).

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective one. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. In addition,

> evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citations and internal quotation marks omitted). This Court "must determine what arguments or theories supported or . . . could have supported[ ]

the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. (citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03(internal quotation marks and citation omitted).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671. Furthermore,

> [a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims of factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows a court to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct (including the CCA), *see Sumner v. Mata*, 455 U.S. 591, 592-93 (1982), and Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin v. Zavaras*, 107 F.3d 1465, 1470 (10th Cir. 1997). "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Court's analysis is not complete "[e]ven if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). "Unless the error is a structural defect in the trial that defies harmless-error analysis, [the Court] must apply the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . ." *Id.*; *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (providing that a federal court must conduct harmless error analysis under *Brecht* anytime it finds constitutional error in a state court proceeding regardless of whether the state court found error or conducted harmless error review).

Under *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637 (citations and internal quotation mark is omitted). "[A] 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." *Bland*, 459 F.3d at 1009 (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). Grave doubt exists when "the matter is so evenly balanced that [the Court is] in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435. The Court makes this harmless error determination based upon a review of the entire state court record. *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000). "In sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Davis v. Ayala*, ─ U.S. ─, 135 S. Ct. 2187, 2199 (2015) (citing *Fry*, 551 U.S. at 119-120).

A claim, however, may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Richter*, 562 U.S. at 98. ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual

conclusion does not require that there be an opinion from the state court explaining the state court's reasoning") (citations omitted).   Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."   *Id.* at 99.

In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated."   *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).   Therefore, the Court "must uphold the state court's summary decision unless [its] independent review of the record and pertinent federal law persuades [it] that [the] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented."   *Id.* at 1178.   "This 'independent review' should be distinguished from a full de novo review of the [applicant's] claims."   *Id.* (citation omitted).   Likewise, the Court applies the AEDPA (Antiterrorism and Effective Death Penalty Act) deferential standard of review when a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the applicant as the federal standard.   *See Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005).   If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim de novo and the deferential standards of § 2254(d) do not apply.   *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

## III.   ANALYSIS

### A.   Claim One/Ineffective Assistance of Counsel

It was clearly established when Applicant was convicted that a defendant has a right to effective assistance of counsel**.**   *See Strickland v. Washington*, 466 U.S. 668 (1984).   To establish that counsel was ineffective, Applicant must demonstrate both that counsel's

performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense. *See id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id.* It is an applicant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances. *See id.*

Under the prejudice prong, an applicant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In assessing prejudice under *Strickland* the question is whether it is reasonably likely the result would have been different. *Richter* at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citing *Strickland*, 466 U.S. at 693.)

Furthermore, under AEDPA, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard," which is the question we would ask if the claim came to us "on direct review of a criminal conviction in a United States district court." *Richter*, 562 U.S. at 101. When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 105.

If Applicant fails to satisfy either prong of the *Strickland* test, the ineffective assistance of counsel claim must be dismissed. *Strickland*, 466 U.S. at 697. Also, ineffective assistance of counsel claims are mixed questions of law and fact. *See id.* at 698.

The Court will address each of the eight ineffective assistance of counsel claims below.

**i. Conceding prosecution's theory of guilt in opening and closing statements**

First, Applicant states that the prosecution's theory, "rooted" in the testimony of cooperating co-defendant Buchanan, was that Applicant stomped on the victim's face, which likely administered the fatal blows, and if the jury had doubts about Applicant being guilty of stomping on the victim's face, it could find him guilty of placing the victim in the trunk of the car. ECF No. 1 at 11.   Applicant contends that the prosecution had to rely on the "dual theory of culpability" for first degree murder because no physical evidence implicated him and no one other than Buchanan, who was cooperating for a lenient sentence identified him as the aggressor.   *Id.*

Applicant asserts that his trial attorney was ineffective because he conceded to the prosecution's theory of guilt when he stated during opening that "Mr. Mingo put [the victim] in the trunk," and in his closing when he stated that Applicant most likely was one of the men doing the stomping since it "could have been any three of the individuals," and rhetorically asked "[c]ould it have been Mingo?" and then answered "yes."   *Id.*   Also, in the Reply, Applicant asserts that the state court improperly characterized the trial attorney's conduct during opening and closing as no more than a rhetorical device to highlight the prosecution's weak case.   ECF No. 37 at 5. Applicant contends even if the trial attorney's approach was a rhetorical device the use of this device was so inappropriate at the time that the use amounts to conceding Applicant's guilt by the trial attorney.   *Id.*   Applicant further asserts his expert, Mr. Castle, presented undisputed evidence that the trial attorney was ineffective because the remarks constituted concessions of guilt.   ECF No. 37 at 4 and 5.   Finally, Applicant contends the trial attorney's affirmative statement that "the other person is Bruce Mingo," when describing the beating of the victim by two

11

men, and the explaining that Buchanan was one of these two parties, are concessions of guilt by the

attorney.   ECF No. 37 at 5.

Regarding this claim, the CCA found as follows.

Defendant first asserts that his counsel was ineffective because, during opening statement and closing argument, he made statements and arguments that were equivalent to a concession of guilt.   We disagree.

Conceding facts tantamount to a concession of guilt can be ineffective assistance of counsel.   *People v. Dillon*, 739 P.2d 919, 922 (Colo. App. 1987).

Here, the prosecution's theory of the case was that defendant committed first degree murder by either stomping on the victim or hiding him in the trunk of the cab while he was still alive.   Defendant asserts that counsel conceded the latter prosecution theory during opening statement because defense counsel stated, "[Defendant] put [the victim] in the trunk."   And during closing argument, counsel stated that defendant could have been one of the people stomping the victim. Discussing who struck the victim, counsel asked, "Could it have been [defendant]?" and then answered, "Yes."   Further, discussing the evidence suggesting that two men fought with the victim while two men watched, defense counsel noted that Buchanan had admitted the assault and stated, "So the other person is [defendant]."

In its order denying defendant's motion, the postconviction court found: "[O]nly a strained interpretation of [trial counsel's] comments, out of context, supports the idea they were actually concessions of guilt.   Read in context, the comments appear to be rhetorical devices attacking Buchanan's version of events and to be arguments directed toward the prosecution's burden of proof."   We agree with the postconviction court.

The alleged concession made during opening statement is as follows:

What do we find? The two people that admitted kicking [the victim] have blood on the bottom of their shoes. It's [the victim's] blood.

Demetris O'Neal, you are going to hear Christopher Buchanan, and there is a real element of truth in this statement, but liars, when they are lying about an event that actually happened, they don't lie about everything.   He's lying about his own involvement.   He's lying about [defendant]'s involvement.   But there is some truth here.   And he says that as Demetris was throwing—was picking up the person in the car, he kind of recoiled because the man's blood was on him.   And, in fact, Demetris

O'Neal has blood of [the victim] right here, exactly where you might expect to find them.

[Defendant] put him in the trunk.   There is no blood on [defendant], not on his shoes, not on his clothes.   He was driving Mr. Buchanan's car.   Some of the items that were tested by [the crime lab] are the pedals, brake pedal, the gas pedal, and the carpet underneath him.   No blood.

In our view, the context in which the statement "[defendant] put [the victim] in the trunk" was made reveals that it was a rhetorical device employed to point out the falsity of that allegation.   The statement was immediately followed by the assertion that no blood was found on defendant, his clothing, or his shoes, or in the driver's area of Buchanan's car, which defendant had driven following the assault. This statement, therefore, is not tantamount to a concession of guilt.

Similarly, counsel's closing argument uses rhetorical devices in an attempt to show the jury the shortcomings in the prosecution's case and to build reasonable doubt:

Demetris O'Neal had on a blue jacket.   He had on a white T-shirt.   Could [the witness's description of a large black man] have been him?   Could it have been Brett Williams?   I don't know. Could it have been [defendant]?   It probably could have.

The other man appeared about two inches taller than the victim.   You have a picture that shows the view that [the witness] has, kind of down like this, not much light.   Of course you are going to look taller than the victim.

If a man the same size as me is pummeling me, I am not standing straight up.   I duck a little bit.   And it could very well appear that someone who is pummeling me, if you are looking at him and you don't see him face to face, if you just see him pummeling me, it might look different.   Could it have been [defendant]?   Yes.

Could it have been other folks?   Yes. It could have been almost anyone.

. . . . .

The important thing, the most important thing[,] is two men were doing the fighting, two men were doing the observing. Except for my questions you would have had the impression that Christopher Buchanan admitted kicking back right?   So the other

13

person is [defendant].

As with the opening statement, we conclude that defense counsel employed rhetorical questions and responses here.   Counsel was in effect contrasting the prosecution's allegation that defendant was the perpetrator with the evidence that he was not, which is not tantamount to a concession of guilt.

*Mingo*, No. 10CA2150 at 9-13; ECF No. 10-3 at 10-14.

Conceding a client's guilt is deficient performance.   *See Fisher v. Gibson*, 282 F.3d 1283, 1304 n.12 (10th Cir. 2002).   Prejudice is presumed to follow an attorney's concession of guilt. *United States v. Williamson*, 53 F.3d 1500, 1511 (10th Cir. 1995).   When there is an allegation that counsel conceded guilt, the focus is "whether, in light of the entire record, the attorney remained a legal advocate of the defendant who acted with undivided allegiance and faithful, devoted service to the defendant." *Id.* (citations and quotations omitted).

Regardless of how trial counsel's remarks are characterized, they do not state a concession of guilt.   *See, e.g., United States v. Swanson*, 943 F.2d at 1071, 1074 (10th Cir. 1991) (defense counsel's statements during closing argument conceding there was "no reasonable doubt" that his client was the perpetrator and that there was "no reasonable doubt" as to an essential element of the offense charged constituted a concession of guilt); *Jones v. State*, 877 P.2d 1052, 1055 (Nev. 1994) (statement during closing argument that "the evidence shows beyond a reasonable doubt that the defendant" was the perpetrator was a concession of guilt); *State v. Harbison*, 337 S.E.2d 504, 505 (1985) (statement by defense counsel that "I don't feel that [the defendant] should be found innocent" was a concession of guilt), *cert. denied*, 476 U.S. 1123 (1986).

In the opening statement, trial counsel stated as follows.

No question Mr. Marouf was beaten savagely.   The question is who did the beating and what was the part that each person made.

It is not against the law to deal with someone that commits a crime.   The prosecution's case against Mr. Mingo depends heavily on Christopher Buchanan.

14

The only evidence you are going to hear that this man did anything to Mr. Marouf is from Christopher Buchanan.

Christopher Buchanan is a person who will admit to you that he has no trouble lying when he's trying to get himself out of a jam.   He comes back to the apartment, he runs away, it's cold, some of us know this is unusual weather for this time of year.   Sometime on March 29th we have delightful weather.   It was very cold to the point where even the officers were wearing heavy winter coats that morning.

4 o'clock in the morning, it's even colder than it is during the day.   Running in a tank top and shorts with $400 and his ID in his pocket.   And he's still going to stick with this ridiculous lie he was on his way to 7/Eleven where he had seen police, that he was going to buy a money order for his rent.   That's ridiculous.   He's going to say it's the truth, but that tells you a little bit about Mr. Buchanan.

The first cop that arrested him, he tried to throw him off.   He will tell you everything he said that day was trying to throw them off of his trail.   Why are you arresting me, I didn't do nothing?   Playing dumb.

The first officer that questioned him was Sgt. Chuck.   He was not there, is what he told Sgt. Chuck.   I was not there when this man got beat.   I had four friends that had left.   I don't really know their names, they left with Demetris.   I walked them to the door and said, See you later.

They left in a white Buick or Regal driven by a man named Leroy.   Leroy is a black male, he's tall, and you're going to see when he gives the description of the height of the person, it's right about Mr. Christopher Buchanan's size, muscular, and he was wearing a white jacket and tan pants.   And that's important, folks.   Because those were the clothes that Christopher Buchanan was wearing.   Those were the clothes that this witness says the aggressor and the beater and the person that knocked Mr. Marouf to the ground and started kicking him was wearing.

So Christopher Buchanan's already thinking of how am I going to get myself out of this jam.   I will make up that someone named Leroy, about my height, wearing my clothes, leaving in another car.   Why?   He knows someone has seen him beating Mr. Marouf and he's got to say that's someone else.   He creates phantom people.

He knew his car left and he told the officers that a person named Charles was driving his car.   And Charles lived on 26th and Newport.   Mr. Brimmer just said that Mr. Buchanan then gave a story, gave a statement and it was an hour-49-minute statement to Detective Barrington.   And this is a quote from Mr. Brimmer, "Not very truthful."   That's an understatement if I ever heard one.   This is a transcript of the statement that Christopher Buchanan gave on March 29th to

Detective Harrington.   Every one of these red stickies is an admitted lie of Christopher Buchanan.   Every one of them.   That's Christopher Buchanan, not very truthful.

On March 29th, we knew Mr. Christopher Buchanan was lying because his lips were moving.   He elaborated on the stories of these phantom three people. Now, he didn't remember that he had said Leroy, but he remembered the L. Called him Lunatic.

And a lot of times when people that aren't very good at lying, lie, they are not real good at filling in detail.   Christopher Buchanan filled in some details.   He talked about the stud earring the people had, talked about the goatee, talked about a tattoo with cursive writing.   Gave you a lot of detail.   All lies.

A description of three people, said they were on acid, said they were Crips. A couple times, you know, honest with you, I'm telling you the truth, said he didn't hit him.   Maintained he didn't hit him through most of the interview.

Detective Harrington says, well, you know, we are going to be doing some tests, we are going to test your shoes, we are going to test your clothes, we are going to see if they have any kind of evidence on them.

At the [sic] point Christopher Buchanan knew he was sunk, so he admitted that he kicked the guy a couple times.   Kicked him in the shoulder.   And even then he admitted that his kicks knocked the man flat on his back.

Mr. Buchanan is charged, he's given some lawyers, Alaurice Tafoya and Susan Fisch, public defenders, good lawyers.   And part of what lawyers do, teach him about what evidence there is in the case, teach him what evidence there is against him.   He learns about evidence at a motions hearing.   Talking with his lawyer he knows he's in real trouble.   And he makes what may seem to you folks is like a hard-times deal.   Minimum of 10, no more than 18.   But it's a whole lot better than life without parole.

Remember what he says, I have no problem lying to get myself out of a jam. He's in the biggest jam of his life.   He's in a bigger jam than most of us will ever see in our life, and he needs to get himself out.

At this point--and you will see, there is very little evidence against Bruce Mingo.   No question, I think you folks, he was there.   He was driving Mr. Buchanan's car an hour, 45 minutes after the car took off.   No evidence against him.   No physical evidence.   But they want him, they want him, they charged him. They charged him based on basically what Chris Buchanan said in that first statement, that Mr. Mingo hit him twice.

He's in a jam, he needs to get out of it.   What does he need to do?   Well, Demetris O'Neal has already made a statement.   He made a statement I believe on March the 30th, that Monday.   And in that statement, he admitted kicking the man. He admitted kicking the man when the man was on the ground and kind of was reaching up to him, so he kicked.

So he needs--Christopher Buchanan needs to do what the prosecution wants.   He needs to give them Bruce Mingo.   He gives a compelling story; and it sounds awful.   This brutal man, if you listen to Chris Buchanan, Chris Buchanan, was in this man's face, Mr. Marouf.   Wasn't angry. Was yelling, talking stuff to each other.   Ms. Connally-McKin will say that.   She was hearing all of this. There was a lot of profanity.   Mr. Buchanan will admit he was being profane. And he's standing there, all of a sudden Demetris O'Neal comes and blasts the guy and then Mr. Mingo comes and blasts him twice.   And then the beating starts.

The only problem, folks, is that we have a disinterested witness, Sheila Connally-McKin.   She doesn't know these individuals.   She doesn't know anyone.   And what does she say?   One man, four men shouting and yelling, one man, he was black, she called him the attacker, he punched the man.   The man goes down to his knees.   Then he kicks him very hard at least two, maybe three times.   One, not two.

What does she say about this individual in terms of clothing?   He was tall. She said he was big.   And when she was questioned and pressed about that, big in relation to the attacker and that may have been because the attacker was on his knees.   Christopher Buchanan is 6 foot 1.   Mr. Mingo is not.   Christopher Buchanan has him at 6-5, 260.   Put Mr. Buchanan and Mr. Mingo next to each other and Mr. Mingo is maybe an inch taller, slightly taller, and he's bigger.   But the person, the aggressor, the one that landed the first punch and knocked Mr. Marouf to the ground and then kicked him was a person wearing light clothing. That's Chris Buchanan.

Frank Pulsipher, another eyewitness, and you are going to hear different stories from these two different people, they saw parts of the same incident.   I don't know what experience you've had, most of us have had, sometimes people that see the same event, you ask what they have seen and they are different.   And it's not that either of them are lying, but people remember different things.   Some of us remember things wrong.

But the one thing Frank Pulsipher says, two people were doing the fighting, two people were mostly watching.

Who do we know who kicked by their own admission Moustapha Marouf? Demetris O'Neal, Christopher Buchanan.

That's not the end of it, though.   There is a lot of physical evidence in this case.   We call it forensic evidence.   And forensic evidence is just the application of science to legal matters, especially crime investigation.

Physical evidence does not corroborate Christopher Buchanan's story. And in the instruction on credibility that you are going to get, you are going to get some tools to aid you in determining credibility.   And one of them, is the story contradicted or corroborated by other evidence in the case?

Detective Frank Harrington, the detective in this case, submitted 53 items of evidence to Greg LaBerge.   Greg LaBerge is a scientist in the Denver Police Department crime lab.   He asked him to look for blood and trace evidence on these 53 items.   They found--not they, Greg LaBerge found blood stains on 11 items. They had taken blood from all four individuals charged, DNA tests, DNA profile. They had taken blood from Mr. Marouf and got a DNA profile.   They then try to get DNA profiles on these 11 items that appear to have blood stains on them and they compared it.

What do we find?   The two people that admitted kicking Mr. Marouf have blood on the bottom of their shoes.   It's Mr. Marouf's blood.

Demetris O'Neal, you are going to hear Christopher Buchanan, and there is a real element of truth in this statement, but liars, when they are lying about an event that actually happened, they don't lie about everything. He's lying about his own involvement.   He's lying about Mr. Mingo's involvement.   But there is some truth here.   And he says that as Demetris was throwing--was picking up the person in the car, he kind of recoiled because the man's blood was on him.   And in fact, Demetris O'Neal has blood of Mr. Marouf right here, exactly where you might expect to find them.

Mr. Mingo put him in the trunk.   There is no blood on Mr. Mingo, not on his shoes, not on his clothes.   He was driving Mr. Buchanan's car.   Some of the items that were tested by Greg LaBerge are the pedals, brake pedal, the gas pedal, the carpet underneath him.   No blood.

That's why you know that Alice McKenzie is not telling the truth.   She made a statement on April 5th to the detectives.   She said that the next day she goes over to Bruce Mingo's house, she lives just down the street on the same block, sees Christopher's car and she went with her sister. She made a videotape of this. And on the videotape, she has Mr. Mingo bringing out some shoes.   And in her words, he had blood all over those shoes.   I mean all over those shoes.   And he had this towel and was wiping it.   And at some point he was going, Damn, all this blood.

There was blood found on both Christopher Buchanan's shoe, on the bottom of the sole, and there was also blood found on Demetris O'Neal's shoe.

There was footprints found as well, blood-stained footprints, one by the door to Christopher Buchanan's apartment, front door, not his individual apartment, but apartment building, and there was also some blood found in the back seat of the car that Demetris O'Neal was riding in initially.   That, for some reason, may have been just a very small sample, didn't yield—wasn't enough to reveal DNA evidence.   We don't know whose blood that is.

But the blood that was on people's shoes gets transferred.   If there is so much blood the next day he's got to wipe it, he's going to be depositing it on those pedals.   Especially the brake pedal. You press that harder than you do an accelerator pedal.   She is going to say there was blood on both shoes.

She is going to say Christopher and Demetris put the body in the trunk. Alice doesn't believe that.   I don't know if she knew that the keys to the cab were found in Christopher Buchanan's pocket.   He's operating the trunk.   He's working the trunk.

The only evidence that you are going to have as to--and there is not a whole lot of blood on the scene, there is not as much blood as you would expect, but the only two individuals who are walking in the blood were--where the body was, and putting it in the trunk, have blood on their shoes, are Christopher Buchanan and Demetris O'Neal.

Listen to Christopher Buchanan's statement as to how many kicks and where the kicks were that were applied to Mr. Marouf.   And then listen to the coroner.   And you know he's not telling the truth either.

I think the case against Mr. Mingo is based upon a person who would lie, has no trouble lying when he's trying to get himself out of a jam.   And he's in a real jam.   And part of what he needs to do is to get out of that jam, is to come into court and tell you folks how this man was the man that really killed Mr. Marouf. That from a man who had so little regard for the truth.   He's going to come in here, and he's going to swear to the truth.   He's going to look you in the eye.

Case No. 98CR2673, Feb. 9, 1999 Trial Tr. at 23-34.

Applicant's concession claim regarding the trial attorney's opening statement is based on one remark made by his attorney.   Applicant contends that his attorney conceded to Applicant's guilt when he stated that Applicant put the victim in the trunk.   This statement is taken out of context based not only on the intent of the remark but also based on the eleven page transcript of the trial attorney's opening statement.   The trial attorney was discrediting Mr. Buchanan's

accountability of Applicant's involvement.   The point the trial attorney was making is how could Applicant have put the victim in the trunk and not have the victim's blood on his shoes, his clothes, or the brake and gas pedal and carpet underneath him in the car that he was driving.   The trial attorney's opening statement is replete with argumentative statements that demonstrate an adversarial representation of Applicant's interests before the jury.   Moreover, because the statements in question are not the functional equivalent of a concession of guilt, much of the reasoning underlying that line of authority is simply inapposite.

Furthermore, the trial attorney's closing argument, like his opening statement, demonstrates an adversarial representation of Applicant's interests before the jury.   Applicant's trial attorney argued as follows.

> If you believe Christopher Buchanan, Mr. Mingo is guilty of something and guilty of something very serious, but you have to believe Christopher Buchanan, and Christopher Buchanan would not recognize the truth unless you slapped him with it across the face.   He is a bald-faced liar.

> How do you prove deliberation?   How do you prove first degree murder? You can't get into someone's head.   You can't tell what someone is thinking. And the proof of first degree murder requires the proof as to what is going on in someone's head at the time of the act.

> You have to have intent to cause the death.   It has to be a conscious objective.   It also has to be after deliberation.   Both of those have to be there. After deliberation, not only must it be intentional, but it means that the decision to commit the act must have been made after the exercise of reflection and judgment during the act.

> Mr. Brimmer is right.   It doesn't take a lot of planning.   You walk in a room.   You see someone across the room and decide I am going to kill them.   You walk across the room and do it.   It might be 30 seconds.   It might be 60 seconds. It must not be, never be, committed in a hasty or impulsive manner.

> If this wasn't a hasty or impulsive crime there just isn't one.   Second degree murder means that someone must knowingly cause the death of another. The definition of knowingly is kind of convoluted, but it essentially means that you were aware of the conduct; that you could be stabbing someone, kicking someone.

But there is a second part and that is that I am aware that my conduct is practically certain to cause the result, in this case, death.   Kicking someone may or may not be second degree murder.

You must intend to kill a person, knowingly kick a person.   You must be certain that that action is going to cause the death.   We can all think of situations where putting a gun to someone's head and pulling the trigger, knowingly putting a gun to the head, knowing that the bullet comes out and goes into the person's head. That is practically certain to cause death.   You folks have to decide.   It's not here.

First degree assault cause means you have to have the intent to cause serious bodily injury.   Again, that has to be a conscious objective.   And one of the questions you folks have to answer is what--not what evidence is there that Bruce Mingo stomped Mr. Marouf viciously, but what credible evidence is there.

It has to be proven. The district attorney just stood up and told you that Christopher Buchanan is credible.   He is to be believed.   Let's look at the eyewitnesses.   Let's look at the other evidence.   See what credible evidence makes this man, this man, not the group, this man guilty of anything.

Survivor's guilt eventually caused him to lie to the police about a couple of things.   There is a robbery.   Chris Buchanan grabbed Marouf out of the car.   He dragged him out of the car.   He said that at first, the first time he talked to the police.

He defended why he said that because he was scared.   That may be a good reason to lie, but he lied.   He got angry.   That was not the truth.   Why did I produce the picture of Brett Williams?   Do you remember when I asked Mr. Bouchaib, were there any white people in this group that went down?   He said, no.

The instruction on credibility gives you some tools to help you determine credibility.   And one of the tools is the ability to observe and that's why I was testing Mr. Bouchaib.   He did not observe very well.   The group of three men, he Didn't see them.

At least three people were doing the stomping.   What three people?   Or was it only two?   Frank saw two people doing the hitting and one doing the stomping.   Kenneth Adams saw one.   When he says he didn't see any white man, what is the conclusion you come to?   He didn't see all four men.

He said he never told the police his friend was robbed.   We know that there was an allegation of robbery from the get-go.   How do we know that?   Do you remember Officer Jones and Officer Hamel.   Officer Jones was dispatched to the 7-Eleven on a robbery.

21

Officer Hamel received three calls.   There was a disturbance at 2424 South York and a robbery victim was at--and I am not sure this is the exact address, but 2410 South University at the 7-Eleven.

Then Officer Jones got through Officer Hamel that a robbery had occurred, been robbed by four people with a gun.   Do you believe there was a gun?   He made that up because he needed to justify to himself and others the reason that he ran.   We might all do that if we had a close friend that was killed.   But that doesn't mean that he is credible.

That doesn't mean that he is reliable.   And we know that initially he lied because he was scared.   Maybe we have two disinterested witnesses.   There is a lot of confusion in their testimony.   There is some inconsistencies.   There are some outright contradictions.

But Christopher Buchanan, the cornerstone of their case, the reliable person, the person that you got to believe says, I was arguing with him.   He was going to fuck me up.   He was getting angry.   He was in his face.

He said Mr. Mingo comes and boom, boom.   That didn't happen, folks. One attack.   He is wearing light clothing.   One attacker wearing light clothing, hits the man, knocks him to his knees, and he kicks him three times.

We know Christopher Buchanan caused that damage that you see on the shoulder.   That is where he kicked him.   You have the statement.   She said the attacker was large and black.   Today or yesterday or the day before she said it was the largest and tallest of the men there.

Let's test how she knew that.   That is why I asked the question, what kind of clothes were these other men wearing?   She had no idea.   What conclusion do we draw from that?   She really didn't see the other men.   She was focused on the attack.   Her impression was that it was the largest and biggest person there.   She didn't see the other men.   She didn't see their clothes.

And then let's look and see who is the tallest.   Do you look from up here down?   Or do you look at this level?   You saw when I had Christopher Buchanan and Bruce Mingo standing side by side because the impression that the prosecution was trying to sell, trying to give you, was that Bruce Mingo is just much, much bigger than all these men.   He is huge compared to these men.   He is much bigger than all of them.   I am exaggerating.

That is what they were trying to do.   I had them stand next to each other. There is no question he is taller.   Dramatically taller?   No.   A couple of inches?

They weigh, and we don't know how much Bruce Mingo weighs, 220, 240, or 265, nine months ago.   Surprisingly, when they turned this way, Christopher

Buchanan was actually bigger than he appeared on the witness stand.   He is not a tall man.

He maybe isn't as thick this way, but if you look at his shoulder, his shoulders are pretty wide this way.   He is not dramatically smaller than Mr. Mingo.   He is smaller, yes.   Brett Williams is between them.   That means we have three people within a couple of inches of each other.

It's winter.   Mr. Brimmer and I are about the same height.   Now, Mr. Brimmer has a thinner face.   We are standing next to each other.   No question.   I am heavier, 20, 30 pounds, maybe more.

You put a big, thick jacket on Mr. Brimmer and have me in regular clothes, and maybe from the back, maybe when it is dark, and he can actually look heavier than me.   It's deceptive.   That's why I asked, what kind of a coat did Bret Williams have on.

Even Sheila Conally-McKin said, it was a large black man.   And she said large because she was thinking in relation to the victim.   And the victim was down on his knees.   She admitted it.   Christopher Buchanan fit that description.

Why else does he fit that description?   He has the light-colored clothes on. He is the only one in light-colored clothes.   That is what makes sense.

Frank Pulsipher, you heard Christopher Buchanan say that Mr. Mingo had on a Georgetown jacket or sweater.   It has a letter.   Mr. Pulsipher didn't have a real good--his ability to observe wasn't real good.   Why?   Because of the lighting. It was not his fault.   The lighting wasn't good.   But the lighting was so dim that he could not tell if these people were Hispanic or black.

When you say Hispanic, most of us think of somebody a little bit darker. But if I am next to Mr. Mingo in any light and if you can't tell, what does that tell about anything else?   You can't see.   But he made one observation.   He did not describe to you a blue jacket with lettering on the front.

What did he describe to you?   At first it was either a blue or purple and white jacket.   And he thought that the white was on the upper part of the sleeve by the right elbow.   I don't know that we have anyone that's been described as wearing those kinds of clothes.

Demetris O'Neal had on a blue jacket.   He had on a white T-shirt.   Could that have been him?   Could it have been Brett Williams?   I don't know.   Could it have been Mr. Mingo?   It probably could have.

The other man appeared about two inches taller than the victim.   You have a picture that shows the view that he has, kind of down like this, not much light. Of course you are going to look taller than the victim.

If a man the same size as me is pummeling me, I am not standing straight up.   I duck a little bit.   And it could very well appear that someone who is pummeling me, if you are looking at him and you don't see him face to face, if you just see him pummeling me, it might look different.   Could it have been Mingo? Yes.

Could it have been other folks?   Yes.   It could have been almost anyone. Then he saw someone doing some stomping.   The second man who was doing the kicking seemed to be larger than the pummeler.   It could have been any three of the individuals.

If the pummeler was Brett Williams or maybe Christopher Buchanan—let's say it was Buchanan.   The stomper could have been Brett Williams or Buchanan--could have been--because Brett Williams is thin.   He testified to that. But he had on a big blue fur-style coat.   That's what he recalls back on March 29. He remembered now it's black.   It added weight.

The important thing, the most important thing is two men were doing the fighting, two men were doing the observing.   Except for my questions you would have had the impression that Christopher Buchanan admitted kicking back, right? So the other person is Bruce Mingo.

See why folks have a right to a lawyer because I got up and Detective Harrington said Demetris O'Neal admitted kicking the man.   He admitted kicking him once to kick his hand away.   Someone in Mr. Position [sic], they are not going to tell you everything they did.   Two people doing the fighting.   Two people told this man, we are doing the fighting.

Now, the fact that two people say they kicked Mr. Marouf tells us part of what was going on.   He said he didn't see the man fall down.   I was talking to my wife.   He missed parts, bits, and pieces.   So maybe he missed the other person doing the kicking.   I don't know.

There is some confusion there, folks.   The case relies on Christopher Buchanan.   We all work from self interest.   The highest form of self interest is self preservation.   And does Christopher Buchanan have a motive for lying?   Would he lie to get himself out of a jam?   In a heartbeat.

Would he lie to you?   What do you think?   He is in jail.   He is looking at life without parole, a 19-year-old man never getting out of prison.   Why was he concerned about that?   Because at the time he made a plea bargain.   The tissue and pattern on Mr. Marouf's face seemed to match.

We know different now because on January 6th a report came back from Mr. Laberge that there was blood on these shoes.   So we know who was probably wearing those shoes.   They've got blood on them.   Not probably, we know there was.

And he knew that if he had to explain to a jury about lying about wearing those Jordon's they are not going to believe him.   Why?

Well, because of the lies he told on March 29, absolute lies, not very good lies.   But he lied and he lied and he lied.   He lied from the very beginning.   His lies are created in lying with what actually happened.   There is some truth thrown in there, okay?

The clearest example of that is when he told the officers, well, you know what?   There were three guys in a white Buick Regal or Cutlass.   And the guy driving is a guy named Leroy.   He was a black male, tall and muscular, wearing a white jacket and tan pants.

Why did he tell the police that?   Why did he give the police the same description of himself wearing the same clothes as himself?   He knew they had been seen.   Who was doing the beating and stomping?   Christopher Buchanan.   He knew that.

Even before that.   What are you doing?   Why are you arresting me?   He knew why they were arresting him.   To save himself what does he have to do?   He must testify truthfully in the trial of Bruce Mingo, Brett Williams and Demetris O'Neal.

What does he need to say?   He knows what he needs to say.   I need to give you guys my co-defendants.   Fine.   No problem.   Whatever you want.   Without him as unreliable as he is, what evidence do you have against Bruce Mingo?

They need to convict Bruce Mingo.   They need credible evidence.   He gave and we went through some of the lies yesterday.   We went through a lot of them.   We didn't go through all of them.   We'd still be here.

First he talked about the three people.   Now, when he talked to Detective Harrington several hours later he still remembered that he had given the guy with a name starting with L.   He forgot Leroy.   Now it's lunatic.

He will spend a lot of time lying.   He will give you details.   He talks about the appearance down to the tattoo on the neck.   There was writing, cursive writing.   The guy had diamond studs in his ears.   They were blue.   He talked about clothes.   He talked about their activities.

He determined they were once doing the stomping.   He talked about the gang affiliation.   And it was all a lie.   He lied about the clothes he was wearing.   He said I was wearing this white tanktop and these shorts at the time of the confrontation.

Why?   That is exactly why because he put Leroy in the clothes he had.   He knew someone had seen him beating this man.   And no one in white tank top and white shorts.   He makes up lies he doesn't even need to.   Okay?

Demetris O'Neal was driving his car, a white Regal or white Cutlass 1984 or 1983.   He leaves while the stomping is going on.   He handed his keys to Bruce.   You all do what you all got to do.   Lies.   During the interview his lying wasn't very compelling.   I didn't kick the man.

Detective Harrington said, well, you know, what we are going to do, trace evidence.   Well, you know, maybe I kicked him.   Then he says, okay, I kicked him in the shoulder, but that is as far as it goes.

He told the detectives, I don't know who put him in the trunk.   He knew who put him in the trunk.   And then the lie that he stuck with from day one.   He just put a man in the trunk.   He's just been involved.   He put a man in the trunk he thinks is dead.   He knows he beat him.

He looks out and sees the cops at 7-Eleven.   And he decides that it's--you know what?   It's 4 o'clock in the morning.   I think it's time for me to go get a money order to pay my rent.

He forgot about that at first yesterday.   He said he went to 7-Eleven to get a drink.   I asked him about his money order.   Oh, yeah.   Yeah, that's it.   And if you believe that--did they believe that?

They have got to try to sell you on Christopher Buchanan and that is one of the things they are going to have to try to sell you on that this man is credible.   And look at the ridiculous stuff he said.

And he goes out in his tank top.   It's cold and he is running.   Let's contrast that with his trial testimony yesterday.

Who had the strongest motive to start stomping on Mr. Marouf.   Who had strongest motive to beat him the way he did?   Not Bruce Mingo.   Chris Buchanan.

He sees some guy who should not be driving, backed into his car, keep on trying to go, pull back in, and then deny doing it.   Now, not only does he deny doing it, but he gets in his face and starts cursing at him.   More than one person said there was some cursing back and forth.   Buchanan said it.   You don't think that is going to get him mad?   He was curious.

The reason I asked the coroner the questions about what kind of injuries you would see were because there were none, but it's obvious.   I knew what Christopher Buchanan had said and we are not talking about a couple of kicks right in here.   We are talking at least two by Christopher Buchanan, two by Brett Williams, four by Demetris O'Neal and four by Bruce Mingo.   That was yesterday.

Mr. Marouf got kicked at least eight times before he got to his hands and knees.   After he got to his hands and knees, he was kicked four to six times in here. There are a couple of bruises in the body area.   One might be a kick.   One is a linear bruise, linear mark like this, not what you get from kicking.

If I fall into this, I am going to get a linear bruise.   It could very well could have been as Demetris O'Neal he bounced off the trunk and that's where he got the linear bruise.   No question this man was dragged.   You can see the dragging here, here, here and even on the knee.   And the pants are torn here and here.   What does she call it, some kind of brushing.   It's almost like road rash, right back here.

He says all four were kicking, all four.   He has to say all four.   Why? That is what he has contracted to do.   That is what he has promised to do.   That is what he was asked to do.   He is doing what he has to do.   But that is completely contradicted by the evidence of the other witnesses.

And that's completely contradicted by Detective Martinez.   He said that Bruce Mingo and Demetris O'Neal put the body in the trunk.   And I have found a little gem in his testimony.

After he opened the trunk of the cab, what happened?   We put the body in the trunk, we.   Mr. Brimmer then said, well, Mr. Garcia didn't go through the whole explanation, did he?   He had another answer after that, right?   Yeah.

The other question that Mr. Brimmer brought up was, who?   Then he said Demetris O'Neal.   Demetris O'Neal does not equal we.

The three of us are together.   They put the body in the trunk.   They do something together.   We put the body in the trunk.   He put the body in the trunk and he is lying about it.   He was asked why he described the three phony guys on March 29.

Well, I was looking out for my friends.   That is why I lied about that. That's why I made up those three guys.   He could care less about his friends.   He was only thinking about himself.   He wasn't the best of friends.   Bruce Mingo helped start the fight.   In fact, there was so much blood on Mr. Mingo's shoes, not only on the soles, but on the side.

Now, Mr. Mingo must be guilty because we don't have any evidence that connects him.   That is what they are saying.   He had an opportunity to get rid of him.   Therefore, lack of evidence means guilt.   That is hogwash.   That is pure speculation.

He had black pants in the laundry room that were recently washed.   He washed off the blood.   He had on jeans.

How do we know that Demetris O'Neal put the body in the trunk?   Look at the blood.   Isn't it ironic that the two people that admitted kicking him have blood on their shoes?   I don't know, there is just a little amount blood and why it stayed there.

Who knows?   Sometimes things happen that we can't explain.   But probably they got the blood from the bottom of their shoes, not from the kicking, but from the stepping into a little bit of blood that was around the cab.   It stuck to their shoes.

Ladies and gentlemen, one of the things that the instructions ask you is not to look at all the evidence, but look at the lack of evidence.   There is no evidence, no credible evidence that Mr. Mingo killed this man.

There is no credible evidence that he kicked this man and booted him; that he hit him with his fists or that he stomped him.   There is some confusion.   There may very well be a lot of confusion as to what happened.

If you are confused and you don't know what happened, that means the matter has not been proven.   It's that simple.   Maybe he did it.   Maybe he hid the evidence.   Maybe he did this or maybe he did that.   It's just speculation.

And you may not even know what happened out there and who did what, but one thing has not been proven and that is that this man did anything other than not stop the beating.   Because of that he has been in jail for almost a year.

Ladies and gentlemen the only verdict in this case is not guilty.   Thank you.

Case No. 98CR2673, Feb. 11, 1999 Trial Tr. at 37-57.

Again, Applicant has taken his trial attorney's remarks during closing argument out of context.   The trial attorney's remarks that it could have been Applicant who did the stomping were in support of his argument that the witnesses' testimonies were not conclusive of which of the four individuals were responsible for kicking and stomping the victim.   The trial attorney's intent

28

was to point out to the jury that the prosecution had not proven that Applicant did anything more than not stopping the beating.

To the extent Applicant relies on the Mr. Castle's expert criminal defense testimony at the Rule 35(c) postconviction hearing, Mr. Castle's findings, like Applicant's, are taken out of context.   Mr. Castle testifies that remarks in the trial attorney's opening statement and in the closing argument were concessions of Applicant's guilt and examples of ineffective assistance of counsel.   Mr. Castle testifies the trial attorney stated that "his client placed the body—was one of two people who placed the body in the trunk," and in closing thinking there was evidence that Applicant had blood on his shoes, attempted to explain "why his client would have blood on his shoes by saying that it probably stuck to the bottom of his shoes while Mr. Mingo was carrying the body to the car."   Case No. 98CR2673,   Feb. 6, 2008 Rule 35(c) Hr'g at 86-87.   Mr. Castle further testifies that the trial attorney in an attempt to explain away the blood on Applicant's shoes also stated that "essentially, he was at the scene" and "walked through the blood instead of stomping the body," and that there was a little amount of blood that stayed on the shoes from stepping into a little bit of blood around the cab.   *Id.* at 92.

Mr. Castle also testifies that in the opening statement the trial attorney stated "Mr. Mingo put him in the trunk," which was preceded by a reference to the victim.   *Id.* at 88.   Mr. Castle further testifies that the trial attorney in the opening statement stated Applicant could have been one of the three men who stomped on the victim, that it could have been the other defendant, but was most likely Applicant, and in making these statements increased the probability that Applicant was one of the stompers to a seventy-five percent chance.   *Id.* at 88-89.   Mr. Castle also testifies the trial attorney indicated that Applicant was one of two attackers when he stated to the jury that Applicant could have been one of the attackers who pummeled the victim, and the trial attorney

29

also conceded that Applicant was the other person doing the kicking when he stated two men were doing the fighting and two were observing, but "except for his questions the jury would have the impression that Christopher Buchanan admitted kicking back." *Id.* at 90.

The Court finds no other remarks by the trial attorney that are addressed by Mr. Castle at the Rule 35(c) postconviction hearing. Furthermore, on cross examination of Mr. Castle at the Rule 35(c) postconviction hearing, Feb. 15, 2008 Rule 35(c) Hr'g at 8, Mr. Castle agreed that a transcript can't really tell or doesn't show a voice inflection.

In the opening statement, the trial attorney stated that Mr. Buchanan and Mr. O'Neal admit to kicking the victim and then that these individuals had the victim's blood on the bottom of their shoes. Case No. 98CR2673, Feb. 9, 1999 Trial Tr. at 30-31. The attorney stated that Mr. O'Neal picked up the victim and recoiled when he got the victim's blood on him. *Id.* at 31-32. Immediately after stating O'Neal had picked up the victim, the trial attorney stated "Mr. Mingo put him in the trunk," but then he stated there is "no blood" on Applicant, not on his shoes, not on his clothes, and not on the pedals or around the pedals, even though he drove. *Id.* at 32. It is clear the trial attorney intended to show that if Mr. O'Neal picked up the victim and got blood on himself, then Applicant if he helped place the victim in the car should also have had blood on himself, his clothes, or his shoes. The trial attorney very explicitly stated during the opening statement that the "only two individuals who are walking in the blood were--where the body was, and putting it in the trunk, have blood on their shoes, are Christopher Buchanan and Demetris O'Neal." *Id.* at 33.

As for the closing argument, the trial attorney when addressing what the assailant was wearing, who was pummeling the victim, and how large he was, stated that the eyewitnesses other than Mr. Buchanan, who has been determined to have lied about multiple issues, did not with any

specificity identify Applicant.   Case No. 98CR2673, Feb. 11, 1999 Trial Tr. at 42-46.   In fact, the trial attorney stated that the two disinterested witnesses' testimonies were confusing, inconsistent, and outright contradictive.   *Id.* at 42.   So when the trial attorney stated that the individual who was attacking the victim could have been Mr. Williams, Mr. O'Neal, or Applicant, he was discrediting the testimony.   *Id.* at 46.   Although the trial attorney's remarks in the closing arguments are somewhat confusing when he stated that "the other person is Bruce Mingo," it is clear that the trial attorney was not conceding but portraying to the jury it is not clear who did what during the attack on the victim.   *Id.* at 47.

Finally, contrary to Mr. Castle's accusation that the trial attorney was attempting to explain away blood on Applicant's shoes, even though it would have been unnecessary because no evidence existed that he had blood on his shoes, the trial attorney's statements in fact were referring to Mr. Buchanan and Mr. O'Neal, the two people who had blood on their shoes. *Id.* at 56.

As argued by Respondents, ECF No. 28 at 19-20, and determined by the CCA, *Mingo*, No. 10CA2150 at 9-13; ECF No. 10-3 at 10-14, the trial attorney's statements noted above were rhetorical and pointed out the shortcomings of the prosecution's case.

Based on the above findings, an objective assessment of the trial attorney's representation reveals he did not cease to function as an advocate on behalf of Applicant in either the opening statement or closing argument.   He argued to the jury both the evidence in the record and the evidence lacking in the record, as well as arguing the weight and the credibility of the witnesses and the evidence.   The trial attorney also focused the jury's attention on the jury instructions and conceded undisputed facts in the record when necessary.

The Court presumes that the CCA's factual determinations are correct.   *See Sumner*, 455 U.S. at 592-93.   Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet this burden.

The Court, therefore, finds that the state court's decision regarding the trial attorney's comments during his opening statement and closing argument were not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable determination of the facts.   This claim, therefore, lacks merit, and Applicant is not entitled to relief.

### ii.   Eliciting incorrect forensic evidence falsely inculpating Applicant

Applicant asserts that his trial attorney called only one witness in the "defense case" to elicit that the victim's roommate could not identify Applicant in a photo lineup, ECF No. 1 at 11, and that the trial attorney also elicited incorrect evidence, apparently from the lead detective, that the victim's blood was found on Applicant's shoes, *id*.   Applicant contends that at his Rule 35(c) postconviction hearing the prosecution's expert concluded that trial counsel's elicitation of the incorrect evidence constituted prejudicial ineffective assistance of counsel.   *Id.*   In his Reply, Applicant contends that the state's expert witness at the Rule 35(c) postconviction hearing agreed with Mr. Castle that the trial attorney's actions rendered his assistance of counsel ineffective and the presentation of uncontested false evidence prejudiced Applicant.   ECF No. 37 at 6.

The CCA addressed this claim as follows.

Next, defendant contends that his trial counsel elicited inaccurate forensic evidence from the only defense witness, which falsely inculpated him.   He asserts that counsel's direct examination of the investigating detective was so unclear as to lead the jury to believe that defendant's shoe had the victim's blood on the sole, which was inaccurate.   We disagree.

Defendant's argument is largely based on the following examination of the investigating detective:

Q: This bag, People's Exhibit 39, did you check that out from the property bureau yourself?

A: No, sir, not that I recall.

Q: Okay.   That's the thing that sometimes you will do especially in crimes especially as an advisory witness, correct?

A: Would I check out the piece of property?

Q: Yes.

A: I could.

Q: These shoes that are in property, [defendant]'s shoes, are they evidence in this case?

A: I would have to assume so, yes.

Q: This shoe was tested for blood, correct?

A: I would assume.   I know that the request was made.

Q: Okay.

A: And there were also some forms that were received showing the outcome of those tests.

Q: In fact, I am going to hand you what I have labeled Defendant's C and ask you to look at it.

A: Okay.

Q: Is that the lab result of the DNA test done by [crime lab employee] on the right shoe?

A: Yes.

Q: And there is a property number there.   Is that number 30?

A: It appears to be.   Yes, sir.

Q: And that matches the bar code here, correct?

33

A: Yes, sir.

Q: That is the report wherein [crime lab employee] tells you that blood matching [the victim] was found on that shoe, correct.

A: Yes, it does.

Before this exchange, defense counsel identified People's Exhibit 39 as Buchanan's right K-Swiss shoe.   But he then used pronouns to refer both to defendant's shoes and Buchanan's shoe.   Were we to rely solely on the cold transcript quoted above, we agree that the jury could have concluded that defendant's shoes had blood on the soles.

But context is again significant.   People's Exhibit 39 was an important piece of evidence that was repeatedly identified as Buchanan's right K-Swiss shoe and was frequently identified as having the victim's blood on the sole.   At the postconviction hearing, one of the prosecutors in defendant's trial testified that defense counsel had gestured to the evidence bag containing Buchanan's shoe during his direct examination, and that defendant's shoes were never admitted into evidence at trial.   The record confirms that assertion.   Counsel's statements referring to "this shoe" could only be referring to Buchanan's right K-Swiss shoe.

Defense counsel's use of plurals and the label "right shoe" also convinces us that he was referring to Buchanan's shoe when presenting the DNA evidence matching the blood on the sole to that of the victim and that the jury would have so understood it.   Counsel consistently used the word "shoes" and the plural pronoun "these" in referring to defendant's shoes.   For example, he stated, "[t]hese shoes that are in property, [defendant]'s shoes, are they evidence in this case?"   In contrast, he used "shoe" and singular pronouns to refer to Buchanan's shoe and the shoe on which the victim's blood was found, namely, "that shoe."

Counsel also identified the lab test as being conducted on the "right shoe" in his examination, saying, "Is that the lab result of the DNA test done by [crime lab employee] on the right shoe?"   Reference to a "right shoe" when the only shoe admitted into evidence at trial was Buchanan's right shoe demonstrates that counsel's questions and the answers referred to Buchanan's single shoe and that the jury would have so understood them.

We conclude counsel's direct examination, while not the clearest elicitation of facts, did not produce false inculpatory evidence detrimental to defendant. Hence, counsel did not provide ineffective assistance in this regard.

*Mingo*, No. 10CA2150, at 13-17; ECF No. 10-3 at 14-18.

First, the trial record shows that trial counsel earlier in his direct questioning of Mr. Harrington, identified Exhibit Nos. 52 through 56 as containing Applicant's personal items. Case No. 98CR2673, Feb. 11, 1999 Trial Tr. at 9.   Previously, during Mr. LaBerge's testimony he identified Exhibit Nos. 52 and 53 as containing Applicant's left and right shoe, respectively.   Feb. 10, 1999 Trial Tr. at 228.   Trial counsel then refers to Exhibit No. 39, which he identifies specifically as Mr. Buchanan's right shoe, Feb. 11, 1999 Trial Tr. at 13, and subsequently refers to a "right shoe" which has a "property number" that is "30," *id.* at 16.   During Mr. LaBerge's direct examination by the prosecution, he identified Property No. 30 as Mr. Buchanan's right shoe.   Feb. 10, 1999 Trial Tr. at 213 and 214-15.   It is clear that trial counsel, during the defense's direct of Mr. Harrington, was again emphasizing to the jury that the victim's blood was found on Mr. Buchanan's right shoe.   Whereas, no blood was found on Applicant's shoes.

With respect to Applicant's claim that the prosecution's witness, during the postconviction hearing, even concluded trial counsel's actions were prejudicial, again trial counsel's statements are taken out of context, and to a certain extent completely misconstrued.   First, the testimony Applicant refers to in his Application, is not by the prosecution's expert, but is that of his own expert, Mr. Castle.   Feb. 6, 2008 Rule 35(c) Hr'g Tr. at 73-140.   Applicant cites to Pages 91 through 93 of Mr. Castle's testimony as support for his claim that the prosecution's witness conceded trial counsel's actions were prejudicial.   Second, Mr. Castle's recapitulation of trial counsel's direct questioning of Mr. Harrington is not accurate.   Based on the above findings, trial counsel did not elicit from Mr. Harrington that the blood of the victim was found on Applicant's shoes.   Nor did trial counsel later refer to a small amount of blood on Applicant's shoes.   As found by the CCA, this claim is based on statements by trial counsel that are taken out of context. The state court record disproves Applicant's alleged basis for this claim.

The Court presumes that the CCA's factual determinations are correct.   *See Sumner*, 455 U.S. at 592-93.   Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet this burden.

The Court, therefore, finds that the state court's decision regarding the elicited, incorrect forensic evidence was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable determination of the facts.   This claim, therefore, lacks merit, and Applicant is not entitled to relief.

### iii.   Not offering a coherent defense theory

Applicant asserts that his trial attorney never presented a coherent defense theory, and that he only focused on Mr. Buchanan's lies.   ECF No. 1 at 11.   Applicant further asserts that his trial attorney failed to elicit and never explained the facts which would have demonstrated Applicant's limited involvement.   ECF No. 1 at 11.   Applicant also contends that his attorney did not argue that even under the prosecution's theory there was no proof of deliberation or intent to kill and did not argue that Applicant did not beat the victim, did not put the victim in the trunk, and that he was innocent.   *Id.*   In his Reply, Applicant further contends that the trial attorney could not argue Applicant's innocence because raising this argument would contradict the attorney's assertions that there was blood on Applicant's shoes and he had placed the victim in the trunk.   ECF No. 37 at 7.

The CCA addressed this claim as follows.

Defendant next contends that counsel provided ineffective assistance at trial because he did not defend with a clear theory of the case.   We disagree.

It is abundantly clear from our review of the trial transcripts that defense counsel had a theory of the case.   In counsel's opening statement, cross-examination, and closing, he focused on attacking Buchanan's credibility and building reasonable doubt.   For example, in his opening statement, counsel stated:

> The prosecution's case against [defendant] depends heavily on Christopher Buchanan.   The only evidence you are going to hear that [defendant] did anything to [the victim] is from Christopher Buchanan.

> Christopher Buchanan is a person who will admit to you that he has no trouble lying when he's trying to get himself out of a jam.

Moments later, counsel showed the jury a written transcript of Buchanan's first statement to the police and stated, "Every one of these red stickies is an admitted lie of Christopher Buchanan.   Every one of them.   That's Christopher Buchanan, not very truthful."   And in closing, counsel repeated and elaborated on his theme, stating, "If you believe Christopher Buchanan, [defendant] is guilty of something and guilty of something very serious, but you have to believe Christopher Buchanan, and Christopher Buchanan would not recognize the truth unless you slapped him with it across the face.   He is a bald-faced [sic] [in original order] liar."

Similarly, counsel's cross-examination of Buchanan and Buchanan's sister, who testified to seeing blood on defendant's shoes and clothing the day following the altercation, focused on their credibility.   Counsel also focused on discrediting the witnesses who testified there were four attackers and that one larger attacker seemed to be doing the stomping, by bringing out on cross-examination that the witnesses did not have a clear view of the event, and could not state that there was a white attacker.

Counsel also argued that the primary attacker could have seemed so large because he was wearing a bulky jacket and appeared in relation to a cowering victim.   Counsel repeated these theories in closing, which focused on creating a reasonable doubt that defendant, one of the largest of the four persons, was the "stomper" and had inflicted the fatal blows.

To have argued that defendant lacked intent or did not act deliberately was certainly a reasonable strategic course open to counsel.   But so was the approach and argument that defense counsel chose.   Disagreement as to trial strategy will not support a claim of ineffective assistance of counsel.   *People v. McDowell*, 219 P.3d 332, 339 (Colo. App. 2009) (citing *People v. Bossert*, 722 P.2d 998, 1010 (Colo. 1986)).   Simply because an alternative strategy was available does not mean counsel was ineffective for not pursuing it.

Furthermore, in determining whether counsel's representation fell below the standard of reasonably competent counsel, a defendant must overcome the presumption that counsel's challenged action may have been sound trial strategy. *Trujillo*, 169 P.3d at 238 (citing *Strickland*, 466 U.S. at 689).   Here, defendant has not overcome that presumption.

*Mingo*, No. 10CA2150 at 17-19;   ECF No. 10-3 at 18-20.

The Tenth Circuit has found that in applying the *Strickland* standard, considerable deference is given to "an attorney's strategic decisions and recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."   *Schreibvogel v. Wyo. Dep't of Corrections State Warden*, 549 F. App'x 805, 808 (10th Cir. 2013) (quoting *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002).

Other than presenting conclusory statements of possible other defense theories, Applicant does not point to any specific evidence that supports his claim of innocence.   Furthermore, as stated above, in addressing the first two ineffective of assistance subclaims, the trial attorney did not concede Applicant's guilt or misstate the facts such that Applicant was prejudiced.   The trial attorney's strategy to discredit Mr. Buchanan and to minimize the other evidence as inadequate appears to be a sufficient defense theory by the trial attorney.

The Court presumes that the CCA's factual determinations are correct.   *See Sumner*, 455 U.S. at 592-93.   Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet this burden.

The Court, therefore, finds that the state court's decision regarding the alleged incoherent defense theory was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an

unreasonable determination of the facts.   This claim, therefore, lacks merit, and Applicant is not entitled to relief.

### iv.   Failing to present the defenses used at co-defendants' trial and the expert testimony regarding who attacked the victim

Based on Messrs. Williams and O'Neal's trial, Applicant contends that his trial attorney had a "roadmap" to present to the jury that the attackers actually were Messrs. O'Neal and Williams and not Applicant.   ECF No. 1 at 12.   First, Applicant contends there was no evidence that anyone intended to kill the victim.   *Id.*   Applicant further contends that (1) the eyewitness testimony was weak; (2) Messrs. O'Neal and Williams testified at Applicant's Rule 35(c) postconviction hearing and confirmed that Mr. Buchanan falsely blamed Applicant for the beating and putting of the victim in the trunk of the car; (3) the blood on Messrs. O'Neal's and Williams' shoes established they are the attackers because eyewitnesses saw two people as observers and Mr. O'Neal admitted to kicking the victim; (4) Mr. Buchanan initially confessed to wearing Air Jordans during the assault but changed his story only after the shoe print on the victim's face matched the pattern of his Air Jordans and opted to plea and testify against everyone; (5) Mr. Buchanan's shoe print matched a print in the doorway to the apartment building where the beating took place; and (6) Mr. Buchanan helped O'Neal put the victim in the trunk and had the keys to the victim's cab when arrested, but Applicant's attorney never called an eyewitness who saw a person who matches Mr. Buchanan's description get in the victim's car after the other three men left.   *Id.* at 12-13.   Applicant further asserts that his trial attorney failed to present the expert testimony from Mool Verma to confirm it was O'Neal who attacked the victim with Buchanan because a hair matching the victim's was on O'Neal's shoe.   *Id.* at 13.

The CCA addressed this claim as follows.

> Next, defendant asserts that counsel was ineffective in failing to employ the strategies used by the attorneys for Williams and O'Neal.   We disagree.

> We first note that the arguments by the attorneys for Williams and O'Neal rested upon the theory that defendant "lost control" and that he alone stomped the victim to death.   Defendant's counsel cannot be faulted for failing to employ that strategy.

> However, defendant also claims that counsel failed to use evidence that provided a "blueprint" for his own defense.   Specifically, defendant asserts that his counsel should have argued some combination of the following: (1) the victim's blood on Buchanan and O'Neal established that they were the attackers; (2) Buchanan was the other attacker because he changed his story only after learning that the shoe print on the victim might match his shoes; (3) Buchanan, not defendant, helped O'Neal put the victim in the trunk; (4) O'Neal was the second attacker because a hair consistent with the victim's hair was found on O'Neal's shoe.

> We conclude that defense counsel did, in fact, present the theory to the jury that Buchanan and O'Neal were the attackers and also presented the argument that Buchanan was unreliable and possibly guilty because of the timing in his change of stories.   These theories each appeared at least once in counsel's opening statement and closing argument. Indeed, counsel's entire theory of the case was that Buchanan's testimony was unreliable and that he had fabricated stories to hide his own guilt.   Counsel also mentioned several times that the physical evidence in the case linked only Buchanan and O'Neal to the attacks.

> We acknowledge that defense counsel did not use the lab report showing the hair found on O'Neal's shoe.   Even so, this may have been a strategic decision because the lab report was inconclusive and only stated that the hair on O'Neal's shoe was consistent with the victim's hair.   Disagreement as to trial strategy will not support a claim of ineffective assistance of counsel.   *McDowell*, 219 P.3d at 339 (citing *Bossert*, 722 P.2d at 1010).

*Mingo*, No. 10CA2150 at 19-21; ECF No. 10-3 at 20-22.

First, a review of the trial transcript and the Rule 35(c) postconviction motion transcript indicates that the trial attorney did raise in either his opening statement, closing argument, or on cross-examination each or all of the issues Applicant raises in this subclaim.   Second, the trial attorney posed to the trial court jury instructions that would include the lesser nonincluded

offenses of second and third degree assault.   Case No. 98CR2673, Feb. 10, 1999 Trial Tr. at 246.

The trial attorney also objected to the jury instruction that included an option for the jury to find

Applicant guilty of first degree murder.   Feb. 11, 1999 Trial Tr. at 5.   Furthermore, the trial

attorney, in closing argument, explained with great detail to the jury the definition of first degree

murder and second degree murder.   *Id.* at 38-39.   The trial attorney also reiterated in closing how

Mr. Buchanan had changed his story, the inconsistencies in eyewitness's testimony about the

beating, the blood on Mr. Buchanan's Air Jordans, and the blood found on Mr. O'Neal's shoes.

*Id.* at 40-55.   The trial attorney's cross examinations and direct of Mr. Harrington, along with the

closing argument, include more than "isolated instances that project a defense," as Applicant

suggests in his Reply.   *See* ECF No. 8.

        Finally, the trial attorney's decision not to use the expert testimony regarding the hair

found on Mr. O'Neal's shoe that matched the victim's is strategic and even if constitutionally

deficient did not prejudice Applicant because the trial attorney used other conclusive evidence;

specifically he addressed on cross and direct the evidence that Mr. O'Neal and Mr. Buchanan had

the victim's blood on their shoes.

        The Court presumes that the CCA's factual determinations are correct.   *See Sumner*, 455

U.S. at 592-93.   Applicant bears the burden of rebutting the presumption by clear and convincing

evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet

this burden.

        The Court, therefore, finds that the state court's decision regarding the trial attorney's

alleged failure to incorporate the same defense strategy used in Messrs. Buchanan and O'Neal's

trial was not contrary to or an unreasonable application of any clearly established rule of federal

law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable

determination of the facts.   This claim, therefore, lacks merit, and Applicant is not entitled to relief.

### v.   Failure to investigate and present testimony from co-defendants regarding Applicant's participation in beating victim

Applicant asserts that Messrs. Williams and O'Neal would have informed the jury that Mr. Buchanan was the one who assisted Mr. O'Neal in putting the victim in the trunk and brutally attacked the cab driver.   ECF No. 1 at 13.   Applicant further asserts that both individuals would confirm that Applicant's participation in the event was as a bystander and that it was Messrs. O'Neal and Buchanan who "delivered the blows to the victim."   *Id.*   Applicant contends that neither Mr. Williams nor Mr. O'Neal were contacted or given the opportunity to testify at his trial and to tell the jury that Applicant did not participate in the beating of the victim.   *Id.*

The CCA addressed this claim as follows.

> Defendant next contends that counsel was ineffective for failing to investigate the possibility of obtaining testimony from Williams and O'Neal.   We disagree.

> At one of the postconviction hearings, O'Neal testified that he was involved in the victim's beating and had helped Buchanan put the victim in the trunk of the cab.   O'Neal also testified that it was Buchanan who stomped the victim to death and that defendant was merely a bystander.   Similarly, Williams testified that Buchanan and O'Neal were the attackers and that defendant did not kick or stomp the victim.   Both claimed that they would have testified at Defendant's trial had they been asked.

> But as previously mentioned, Williams and O'Neal based their trial defense on defendant's guilt.   Furthermore, at the time of defendant's trial, Williams and O'Neal were awaiting sentencing before the same judge who was presiding over defendant's trial.   Essentially, Williams and O'Neal would have had to testify before the judge who was to sentence them that they had put forth a false defense in their trial.   And one of their attorneys testified that, if he had been approached by defendant's counsel, he would have advised his client not to testify at defendant's trial.

> The postconviction court found Williams's and O'Neal's assertions that they would have been willing to testify at defendant's trial "completely incredible."

The court further found that even if they were willing to testify, it would not have changed the outcome of defendant's trial.

We will not overturn a postconviction court's findings of fact unless such findings are clearly erroneous.   *Villarreal*, 231 P.3d at 33.   Given the timing of defendant's trial in relation to the sentencing of Williams and O'Neal, the testimony of the attorney that he would have advised his client not to testify, and the jury's belief of Buchanan's testimony despite knowledge of a plea agreement and his prior lies, we cannot say that these credibility and outcome findings are erroneous.

*Mingo*, No. 10CA2150 at 21-23; ECF No. 10-3 at 22-24.

Applicant's claim that Messrs. Williams and O'Neal would have testified at his trial is highly speculative for the following reasons.   Almost ten years had passed since Applicant was convicted, before Messrs. Williams and O'Neal testified; and only after they had been sentenced and subsequently released did they elect to testify that Mr. Buchanan, not Applicant, was the person who continued to kick the victim and direct the placing of the victim in the trunk of his car. Case No. 98CR2673, Nov. 20, 2007 Rule 35(c) Hr'g Tr. at 5-109.   On cross examination at the Rule 35(c) postconviction hearing, Mr. Williams and Mr. O'Neal stated that they were testifying because they now believe they need to tell the truth about what happened when the victim was beaten and placed in the trunk of his car.   *Id.* at 21 and 102.   It was further pointed out on cross examination that for the ten years prior to the Rule 35(c) hearing both individuals had opportunities to counter Mr. Buchanan's testimony but they opted not to do so.   It was also pointed out that both individuals were pending sentencing before the same judge, who at that time was presiding over Applicant's trial and that they relied on Mr. Buchanan's testimony as their defense in their trial.

Given the delay in coming forward, the basis for the defense in their trial, and their pending sentencing during Applicant's trial, it is not believable that Messrs. Williams and O'Neal would have testified at Applicant's trial if asked.   It also is not credible that after ten years they attest that

Applicant did not participate in beating the victim or placing him in the trunk of his car.

Accordingly, Applicant fails to carry his burden of clear and convincing evidence that indeed Mr.

Williams' and Mr. O'Neal's testimonies were credible and that they would have testified at the

time of his trial.

Therefore, a reasonable argument exists for finding that counsel satisfied the *Strickland*

deferential standard.   *See Richter*, 562 U.S. at 105.   The CCA decision regarding this claim did

not result in a decision that was contrary to, or involve an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States and did not

result in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.   This claim, therefore, lacks merit, and

Applicant is not entitled to relief.

### vi.   Failing to object and waiving Applicant's right to confront co-defendant on his lighter sentence for testifying

Applicant asserts that his trial attorney failed to object and demand immediate remedies,

including mistrial and/or recusal, when the trial court offered an inducement for Mr. Buchanan's

testimony at Applicant's trial.   ECF No. 1 at 14.   Applicant further asserts that his trial attorney

waived Applicant's right to cross examine Mr. Buchanan about the added benefit he expected to

receive for testifying in Applicant's trial like he testified in Messrs. Williams and O'Neal's trial.

*Id.*   In the Reply, Applicant asserts that the trial attorney should have sought recusal of the judge

to insure impartiality and the integrity of the proceedings.   ECF No. 37 at 11.   Finally, Applicant

contends in the Reply that the trial court coerced a witness to testify against him based on the

stipulations of the plea agreement and assured the witness that he would receive "favorable

consideration," which is unconstitutional.   *Id.* at 12.

The CCA addressed this claim as follows.

> During the course of defendant's trial, the prosecutor informed the court that Buchanan was going to refuse to testify.   During a conference, the court expressed the view that someone who cooperated with the government should be given "much more favorable consideration" than perpetrators who did not, and stated that it had a "significant concern that those who did not cooperate may be doing better in the long run that those who did cooperate."   The court further stated that "there is some latitude in that agreement that Mr. Buchanan struck with the People."   The court instructed Buchanan's counsel to relay the court's thoughts to Buchanan, who changed his mind and agreed to testify.

> Defendant contends that defense counsel failed to object to the trial court's offer to Buchanan of an additional incentive for testifying and failed to demand immediate remedies, including a mistrial or recusal.   Further, he asserts that defense counsel improperly waived the right to cross-examine Buchanan concerning this "added benefit."   We address these issues below in conjunction with defendant's assertions of denial of his right to a fair trial and due process.

*Mingo*, No. 10CA2150 at 23-24 ; ECF No. 10-3 at 24-25.   Based on the findings and conclusions set forth below in the discussion in Claim Three, the Court finds that Applicant fails to assert an ineffective assistance of counsel claim.

### vii.   Failing to assure the jury was properly instructed

Applicant asserts that his trial attorney did not submit a single jury instruction.   ECF No. 1 at 16.   In particular, Applicant contends that the trial attorney never submitted an instruction on the inherent unreliability of an accomplice's testimony or an intoxication instruction.   *Id.* Applicant also asserts that the trial attorney did not submit a theory of the case instruction; and he further contends that his trial attorney failed to object to the prosecution's complicity instruction, which should not be given unless there is evidentiary support for deliberation or intent to commit first degree murder.   *Id.*

In the Reply, Applicant asserts that the trial attorney was ineffective because he lacked the knowledge of applicable law and failed to research pertinent jury instructions.   ECF No. 37 at 13. Applicant also contends that there was plenty of evidence that he was intoxicated, which is a

defense to first degree murder; but the trial attorney failed to properly investigate and consider the defense as an instruction.   *Id.*

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."   *In re Winship*, 397 U.S. 358, 364 (1970).   However, not every "ambiguity, inconsistency, or deficiency" in a jury instruction renders the instruction constitutionally infirm. *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).

It is not "the province of a federal habeas court to reexamine state-court determinations on state law questions."   *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).   As a preliminary matter, "errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law."   *Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997) (internal quotation marks and citations omitted).

The CCA addressed the failure to challenge or introduce jury instructions claim as follows.

Defendant asserts that counsel was ineffective for failing to request an instruction on uncorroborated accomplice testimony, failing to object to the complicity instruction, and failing to submit a theory of the case instruction.   We disagree.

Defendant asserted the uncorroborated accomplice testimony and complicity contentions in his direct appeal.   The *Mingo I* division concluded that Buchanan's testimony was corroborated and that the evidence supported giving an instruction on complicity.   Hence, the failure to request an instruction concerning uncorroborated accomplice testimony and failure to object to the complicity instruction could not have prejudiced defendant.

Concerning counsel's asserted failure to submit a theory of the case instruction, the postconviction court found that counsel presented his theory of the case in opening statement and closing argument, and that there was no reason to believe that the jury would have rendered a different verdict had a theory of the case instruction been given.   Because they are not clearly erroneous, we will not disturb

these findings of fact, *see Villarreal*, 231 P.3d at 33, and in any event, we agree with the court's conclusion.

*Mingo*, No. 10CA2150 at 24-25; ECF No. 10-3 at 25-26.   The Court will discuss each jury instruction issue below.

### a.   Complicity Instruction

On direct appeal, the CCA addressed Applicant's complicity instruction claim as follows.

III.   Complicity Instruction

Next, defendant contends that the trial court denied his right to a fair trial by giving a complicity instruction.   He argues that the instruction was improper because, in his view, the prosecution did not establish that any of the other co-defendants committed all or part of the crime.   We are not persuaded.

Complicity is defined in § 180-1-603, C.R.S. 2000, as follows: "A person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense."

If the evidence demonstrates that two or more persons were jointly engaged in the commission of the crime, it is appropriate for a trial court to instruct the jury on complicity.   *People v. Calvaresi*, 198 Colo. 321, 600 P.2d 57 (1979); *People v. Osborne*, 973 P.2d 666 (Colo. App. 1998).

Here, the jurors were instructed as to complicity consistent with *Bogdanov v. People*, 941 P.2d 247 (Colo. 1997).   Again, because defendant did not object to that instruction at trial, we review this issue for plain error only.   *See People v. Page, supra.*

Here, the evidence established that four men played a part in the victim's death.   An eyewitness testified that she saw the four men standing over the victim and kicking him.   Another witness testified that he saw four men in the parking lot early that morning.

Based on that evidence, the jury could have found that the co-defendants committed all or part of the crime and that defendant was guilty of first degree murder as a principal or as a complicitor.   Therefore, the trial court did not err, let alone commit plain error, in instructing the jury on complicity.   *See People v. Osborne, supra.*

47

We also reject defendant's related contention that the complicity instruction did not accurately inform the jurors as to the intent necessary to commit murder. To the contrary, the court provided the jury with the revised complicity instruction as set forth in *Bogdanov v. People, supra*.   That instruction provided in part that "the defendant must have the intent to promote or facilitate the commission of the crime."   No more was required in this regard.

*People v. Mingo*, No. 99CA0882, 6-8 (Colo. App. Dec. 7, 2000); ECF No. 10-2 at 7-9.

Under Colorado principles of complicity, a person is legally accountable for the actions of another if, "with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in . . . committing the offense."   Colo. Rev. Stat. § 18-1-603 (Effective July 1, 1997).   There is a dual mental state requirement of the complicitor that must be proven before an accused may be legally accountable for the offense of another.   "First, the complicitor must have the culpable mental state required for the underlying crime committed by the principal.   Second, the complicitor must intend that his own conduct promote or facilitate the commission of the crime committed by the principal."   *Bogdanov v. People*, 941 P.2d 247, 252 (Colo.) (en banc), amended, 955 P.2d 997 (Colo. 1997), *disapproved of on other grounds by Griego v. People*, 19 P.3d 1 (Colo. 2001) (en banc).   Under a complicity theory, "it is not necessary that any single person commit all the elements of the underlying offense.   It is only necessary that the acts of the complicitor and the other actor or actors, together, constitute all acts necessary to complete the underlying offense."   *People v. Elie*, 148 P.3d 359, 365 (Colo. App. 2006).

At Applicant's trial, Instruction number 6 stated:

A person is guilty of an offense committed by another person if he is a complicitor.   To be guilty as a complicitor, the following must be established beyond a reasonable doubt:

1. A crime must have been committed.

2. Another person must have committed all or part of the crime.

3. The defendant must have had knowledge that the other person intended to commit all or part of the crime.

4. The defendant must have had the intent to promote or facilitate the commission of the crime.

5. The defendant must have aided, abetted, advised, or encouraged the other person in the commission or planning of the crime.

Colo. Crim. Case No. 98CR2673, Register of Actions at 32.   Instruction 6 was compliant with the definition of a complicitor in § 18-1-603 and *Elie*, 148 P.3d at 364-65.

Contrary to Applicant's claims, there was sufficient evidence to establish that Applicant acted with the intent to commit first degree murder.   A review of the trial transcript indicates sufficient evidence based on the testimonies of the eyewitnesses and the police investigators that the victim had been beaten by at least two of four individuals and then placed in the trunk of his car, which resulted in his death.   Mr. Buchanan's testimony then provided sufficient evidence that Applicant had the intent to commit first degree murder.

The Court presumes that the CCA's factual determinations are correct.   *See Sumner*, 455 U.S. at 592-93.   Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin*, 107 F.3d at 1470, which for the above stated reasons he has failed to meet this burden.

Because there was sufficient evidence that Applicant had the intent to commit first degree murder, the Court finds it is reasonable that the trial attorney would not object to the complicity instruction.   Applicant, therefore, has failed to overcome the strong presumption that the trial attorney's performance fell within the range of "reasonable professional assistance," *see Strickland*, 466 U.S. at 689, when he did not object to the complicity instruction.

### b.  Unreliability of Accomplice's Testimony Instruction

On direct appeal, the CCA addressed Applicant's uncorroborated accomplice testimony

claim as follows.

### II.  Uncorroborated Accomplice Testimony

Defendant next contends that the trial court committed plain error by failing to instruct the jury, *sua sponte*, on the unreliability of uncorroborated testimony of the accomplice.  We disagree.

COLJI-Crim No. 4:06 (1983), provides a model jury instruction that must be given when the prosecution's case is based entirely upon uncorroborated testimony of an accomplice.

However, such an instruction is required only if the accomplice's testimony is wholly uncorroborated.  The testimony need not be corroborated in every part; corroboration of one element of the testimony is sufficient.  A confession or admission by the defendant may corroborate the testimony of an accomplice. *People . Montoya*, 942 P.2d 1287 (Colo. App. 1996).

. . . .

Here, the accomplice's sister testified that she went to defendant's house the day after the murder.  Defendant then admitted to her that, at the time of the murder, he was in the parking lot with the accomplice and that the two of them and the two co-defendants kicked the victim.  She also saw that the defendant's hands had small, fresh cuts all over them.  Her testimony thus corroborated the accomplice's testimony.  Further the credibility of her testimony was for the jury to determine.  *See People v. Quick*, 713 P.2d 1282 (Colo. 1986).

In addition, an eyewitness to the crime testified that the largest of the four men was black and did most of the kicking.  In unrelated testimony, another witness established that defendant was the largest of the four mem, and it was uncontested that defendant is African-American.  This testimony further corroborated the accomplice's testimony.

Accordingly, we conclude that the court did not err, let alone commit plain error, by not giving a corroboration instruction *sua sponte*.

*Mingo*, No. 99CA0882 at 5-6; ECF No. 10-2 at 6-7.

The Court presumes that the CCA's factual determinations are correct.  *See Sumner*, 455

U.S. at 592-93.   Applicant bears the burden of rebutting the presumption by clear and convincing

evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet this burden.

The lack of a jury instruction regarding the reliability of an accomplice's testimony, therefore, does not deprive Applicant of a fundamentally fair trial and violate his due process rights. *Nguyen*, 131 F.3d at 1357. It, therefore, is reasonable that the trial attorney did not request the uncorroborated testimony of an accomplice instruction. Applicant, therefore, has failed to overcome the strong presumption that the trial attorney's performance fell within the range of "reasonable professional assistance," *see Strickland*, 466 U.S. at 689, when he did not request the uncorroborated testimony instruction.

### c.   Theory of Case Instruction

As discussed above, in subclaims ii. and iii. of Claim One, the theory of the case was presented sufficiently by the trial attorney in the opening statement and the closing argument.

The Court presumes that the CCA's factual determinations are correct. *See Sumner*, 455 U.S. at 592-93. Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet this burden.

Even if the trial attorney fell below an object standard of reasonableness in not requesting a theory of case instruction, Applicant has not demonstrated that this deficient performance was prejudicial to his defense. *Strickland*, 466 U.S. at 687 (Applicant must demonstrate both that counsels performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense.)

### d.   Intoxication Defense Instruction

A claim may be adjudicated on the merits in state court even in the absence of a statement

of reasons by the state court for rejecting the claim. *Richter*, 562 U.S. at 98. In particular, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (collecting cases). Thus, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. "Where there has been one reasoned state judgment rejecting a federal claim," federal habeas courts should presume that "later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (supported in *Hittson v. Chatman*, — U.S. —, 135 S. Ct. 2126 (June 15, 2015) (Ginsburg, J., concurring in denial of certiorari review).

Even "[w]here a state courts decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter* 562 U.S. at 98. In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated." *Aycox*, 196 F.3d at 1177. Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id.*

The trial court addressed the intoxication instruction as follows.

Additionally, although there was evidence of intoxication, there does not appear to have been any evidence that Mr. Mingo was so intoxicated that he was incapable of acting intentionally, *See* COLJI 7:13.

Colo. Crim. Case No. 98CR2673, Register of Actions at 375.   Applicant contends that based on the testimony given by Mr. Buchanan on direct and cross examination, there was ample evidence that he was intoxicated during "all material times."   ECF No. 1 at 16.   The testimony Applicant relies on is as follows.

Direct Examination of Mr. Buchanan

Q.      Okay.   By the time that you leave to go to Muddy's at about midnight, how intoxicated is Demetrius O'Neal?

. . . .

Q.      Now Bruce Mingo.   Same questions for him.   Could he walk all right?

A.      Yes.

Q.      Could he talk fine?

A.      Yes.

Q.      And could he understand what was being said to him?

A.      Yes.

Q.      And was he aware of what was going on around him?

A.      Yes.

. . . .

Q.      By the way, let's talk about Muddy's.   Did you have anything to drink at Muddy's?

A.      No.   Just on the way.   That's it.

Q.      Okay.   What did you have to drink on the way?

A.      Just E & J again.   The same bottle.

Q.      And you have--did you include that quantity when I asked you about how much people had to drink earlier or is this in addition to that?

> In other words, when you were talking about doing some shots
> earlier, are you including those shots in the amount that you had to
> drink in the car on the way to Muddy's?

A.      Yes.

Q.      Okay.   And just so we're clear, was everyone drinking on the way to
Muddy's?

A.      Yes.

Q.      Or was anyone?

A.      Yes.

Q.      We're people drinking the brandy?

A.      Yes.

Q.      Were you doing any drugs on the way to Muddy's?

A.      No.

Q.      And did you see anyone drinking or smoking once you get back to your
apartment sometime around 2:00 a.m.?

A.      No.

Case No. 98CR2673, Feb. 10, 1999 Trial Tr. at 49-50 and 63-64.

On cross examination, Mr. Buchanan stated that while he was at Applicant's house he and Demetrius O'Neal smoked a blunt, which is the wrapping of a cigar (5-inch Swisher Sweet) filled with marijuana.  *Id.* at 114-115.   Mr. Buchanan does not assert that Applicant participated in smoking the blunt.

Nothing Applicant cites to in Mr. Buchanan's testimony demonstrates with clear and convincing evidence Applicant was so intoxicated that if an intoxication defense instruction had been given to the jury the outcome of Applicant's conviction would have been different.

There is no basis for finding that not providing an intoxication defense instruction was so fundamentally unfair as to deprive Applicant of a fair trial and to due process of law.   *Nguyen*, 131 F.3d at 1357.   It, therefore, is reasonable that the trial attorney did not request the instruction; and Applicant has failed to overcome the strong presumption that the trial attorney's performance fell within the range of "reasonable professional assistance," *see Strickland*, 466 U.S. at 689, when he did not request the instruction.   Furthermore, even if the trial attorney's failure to request the instruction was not within a reasonable professional assistance range, Applicant has failed to demonstrate he was prejudiced by the instruction not being given to the jury.

### e.  Conclusion

Therefore, a reasonable argument exists for finding that counsel satisfied the *Strickland* deferential standard with respect to the jury instruction claims.   *See Richter*, 562 U.S. at 105. The CCA decision regarding these claims did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   Applicant's jury instruction claims lack merit.   Applicant, therefore, is not entitled to relief.

### viii.  Interfered with Applicant's right to testify

Applicant asserts that his trial attorney, and not him, made the decision that he would not testify in violation of his Fifth, Sixth, and Fourteenth Amendment rights.   ECF No. 1 at 16. Applicant further asserts his trial attorney failed to obtain a delay of the conviction in Applicant's other criminal case past the conclusion of the criminal case at issue in this action, which resulted in the possible use of the other conviction to impeach Applicant's credibility if he testified in his own

defense at trial in the criminal case at issue in this action.  *Id.* at 16-17.   In the Reply, Applicant

contends that his statements made to the court were coached and guided by the trial attorney's

decision to not allow Applicant to testify, which rendered his statements involuntary and

unreliable.   ECF No. 37 at 14.

The CCA addressed this claim as follows.

Defendant contends that counsel's performance was deficient because counsel interfered with his right to testify.   We disagree.

Defendant testified at a postconviction hearing that his attorney made the decision that he would not testify, instead of that being his own personal decision. In rejecting that assertion, the postconviction court specifically found that defendant's testimony was self-serving, contrary to the statements he had made to the trial court during the *Curtis* advisement, was not supported by any other evidence, and was not credible.

A postconviction court determines the weight and credibility to be given to the testimony of each witness and its findings will not be disturbed on review unless clearly erroneous. [*Villarreal., 231 P.3d at 33*].   The postconviction court did not believe defendant's testimony concerning counsel's asserted actions on the Curtis advisement issue.   We conclude the postconviction court's findings are supported by the record and therefore are not clearly erroneous.

*Mingo*, No. 10CA2150 at 25-26; ECF No. 10-3 at 26-27.

A review of the trial transcripts indicates Applicant was instructed as follows by the trial

court regarding his right to testify.

THE COURT: Mr. Mingo, you've heard the prosecutor say that he rested his case. The time has come where you need to make a decision.   The decision is whether to testify in your own defense or to remain silent.

You have the right to either--to do either one of those things.   What you need to understand is that the decision belongs to you.   While it's appropriate that you should talk to your attorney about it and get the benefit of your attorney's advice, it's your decision ultimately.   Do you understand that?

THE DEFENDANT:  Yes.

THE COURT: Now, there are certain disadvantages, I suppose, to testifying.

If you take the stand and become a witness, your credibility; that is, your believability, is in issue just as it is with any other witness.   So certain things that go to your believability could be shown that couldn't be shown if you don't take the stand because your believability is not at issue if you don't take the stand.

For example, if you made any statements previous to this which are inconsistent with what you testified to, those statements could be brought out.   For example, if you have a prior felony conviction, that's one thing the jury can consider in Colorado in determining whether any witness is believable or not.   So that's one thing that could be shown if you take the stand and that cannot be shown if you don't take the stand.

The important thing though is to understand that it's your--your choice, not your attorney's choice, whether to stake [sic] the stand.   Do you understand this?

THE DEFENDANT:  Yes.

THE COURT: Now, Mr. Garcia is your spokesman here in the courtroom.   If he stands up and says the defense rests without calling you as a witness and he does so in your presence while you're sitting here, will I be correct in assuming that it was your choice not to testify?

THE DEFENDANT:  Yes

THE COURT: And conversely if he stands up before the defense rests and says, I call Mr. Mingo to the stand, would I be correct in assuming that it was your choice to testify?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions about this?

THE DEFENDANT: No.   Huh-uh.

Case No. 98CR2673, Feb. 10, 1999 Trial Tr. at 244-45.

The Court finds no basis for the right to testify claim.   Applicant was advised thoroughly of his right to testify, the ramifications of testifying, and was asked if his decision was made of his own free will.   Without hesitation, Applicant responded to the trial court that he understood that it was his choice and not his attorney's choice to decide whether he would testify or not.

Based on the above findings, Applicant fails to demonstrate by clear and convincing evidence that the trial attorney interfered with his decision to testify or to not testify; and as a result his performance was not within a reasonable professional assistance range.   Applicant also fails to demonstrate he was prejudiced.   Applicant's claims that his statements to the trial court were involuntary and unreliable are conclusory and vague and without any support on the record or otherwise.   The CCA's decision, therefore, is not contrary to, or an unreasonable application of, established Supreme Court precedent.   This claim, therefore, lacks merit, and Applicant is not entitled to relief.

### ix.   Conclusion

Upon review of all eight ineffective of assistance subclaims, and based on the findings above, the Court finds that Claim One lacks merit and will be dismissed.

## B.   Claim Three/Improper Sentencing Inducements for Prosecution Chief Witness

Applicant asserts that the trial court told the district attorney, his attorney, and Mr. Buchanan's attorney that "given the content of his previous testimony Buchanan could expect to be rewarded if he testified against me."   ECF No. 1 at 18.   Applicant further asserts that his Fifth, Sixth, and Fourteenth Amendment rights were violated when he was not present during the meeting with his attorney, the district attorney, and Mr. Buchanan's attorney regarding Mr. Buchanan testifying at Applicant's trial.   *Id.* at 19-20.   Applicant also contends that a judge has the authority to advise a witness of the consequences he faces if he continues to refuse to testify, but a judge cannot coerce a reluctant witness by "(1) advising that the court typically rewards cooperating witnesses and (2) suggesting that testimony similar to what the witness provided at the earlier trial of co-defendants would likely yield a sentence shorter that the ones co-defendants would receive."   *Id.* at 20.   Finally, Applicant contends that if a prosecution witness refuses to

testify unless he receives additional sentencing concessions he must negotiate any additional demands with the prosecutors.   *Id.*

In the Reply, Applicant asserts that coerced statements are presumed to be unreliable and his due process rights are violated when a witness is coerced to testify pursuant to *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999).   ECF No. 37 at 15.   Applicant further contends that the trial judge improperly interjected himself into Mr. Buchanan's plea bargaining process in violation of Colo. R. Crim. P. 11(f) and *Liteky v. United States*, 510 U.S. 540 (1994).   *Id.* Finally, Applicant argues that his Sixth Amendment rights were violated when he was denied his right to be present during the discussions in chambers about Mr. Buchanan's plea agreement.   *Id.* at 16.

Respondents assert in the Answer that this claim is procedurally defaulted.   ECF No. 28 at 40-41.   Respondents concede that they neglected to assert this argument in the Pre-Answer Response, but the defense should not be barred because Respondents did not knowingly, intelligently, and expressly waive the defense but failed to assert the defense due to inadvertence or error.   *Id.* at 42.   Respondents also contend that Applicant is not prejudiced by Respondents waiting to argue this defense, as he may respond to the argument in his Reply to the Answer.   *Id.* at 43-44.   Respondents also argue that even if the Court considers this claim on the merits there was no Supreme Court case holding that the right to due process or a fair trial is violated by a trial court's act of assuring a reluctant witness favorably consideration will be given at his sentencing for his cooperation.   *Id.* at 45-46.   Furthermore, Respondents argue that to the extent the CCA applied general due process principles that analysis was not an unreasonable application of such principles.   *Id.* at 46.

59

In the Reply, Applicant argues that his actual innocence claim "trumps the procedural default card."   ECF No. 37 at 14.   Applicant further contends that, nonetheless, this claim was properly preserved and rises to the level of plain error, because it is well settled that coerced statements are presumed unreliable and his due process rights are violated when a witness's testimony is coerced.   *Id.* at 14-15.

First, "state-court procedural default . . . is an affirmative defense," and the state is "obligated to raise procedural default as a defense, or lose the right to assert the defense thereafter."   *See Gray v. Netherlands*, 518 U.S. 152, 165-66 (1996).   In the Order to File Pre-Answer Response, the Court instructed Respondents to address the affirmative defense of exhaustion of state court remedies.   The Court also directed Respondents that if they did not intend to raise exhaustion as an affirmative defense they must notify the Court.   Rather than address the procedural default issue with respect to the coerced testimony claim, Respondents stated that this claim was presented to the CCA and CSC (Colorado Supreme Court) on postconviction appeal.   ECF No. 10 at 15.   Nonetheless, Respondents did not explicitly waive the defense.

The "best procedure is to plead an affirmative defense in an answer or amended answer." *See Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) (finding defendants were not necessarily barred from raising a qualified immunity defense in their motion for summary judgment).   A constructive amendment is allowed if there is no prejudice to the opposing party and the amendment is not unduly delayed, done in bad faith or with a dilatory motive.   *Id.*   Here, Respondents' procedural default claim clearly was presented in the Answer, and Applicant had sufficient time to address the affirmative defense in his Reply to the Answer.   There is no evidence of prejudice to Applicant or of undue delay, bad faith, of dilatory motive by Respondents.

60

Respondents, therefore, are not barred from raising the exhaustion affirmative defense in their Answer with respect to the coerced testimony claim.

Relying on *Douglas v. Workman*, 560 F.3d 1156, 1177-78 (10th Cir. 2009), and *Cargle v. Mullin*, 317 F.3d 1196, 1205-06 (10th Cir. 2003), Respondents argue that when a state court "*recognizes* or *assumes* that an unpreserved claim reveals a federal constitutional error, but declines to reverse on the basis that the error is not sufficiently obvious or prejudicial to be 'plain,' the claim is procedurally defaulted."   ECF No. 28 at 41.

In *Douglas*, the Tenth Circuit restated the finding in *Carole*, as follows.

> As for procedural bar, the question is: does a state court's plain-error review of an issue otherwise waived for lack of a trial objection constitute a merits decision under *Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed.2d 308 (1989), thus negating application of procedural bar, or does OCCA's use of the heightened standard of plain error constitute the enforcement of a state waiver rule under Harris, thus necessitating application of procedural bar? . . . As for § 2254(d), the question is: does a state court's use of a plain-error standard affect the deference that the federal court owes to the state court's determination? . . .

> In our view, the answer to both questions depends on the substance of the plain-error disposition.   A state court may deny relief for a federal claim on plain-error review because it finds the claim lacks merit under federal law.   In such a case, there is no independent state ground of decision and, thus, no basis for procedural bar.   Consistent with that conclusion, the state court's disposition would be entitled to § 2254(d) deference because it was a form of merits review. On the other hand, a state court could deny relief for what it recognizes or assumes to be federal error, because of the petitioner's failure to satisfy some independent state law predicate.   In such a case, that non-merits predicate would constitute an independent state ground for decision which would warrant application of procedural-bar principles on federal habeas.   If the state procedural bar were then excused for some reason, the federal court would be left to resolve the substantive claim de novo, unconstrained by § 2254(d).

*Douglas*, 560 F.3d at 1177-78 (quoting *Carole*, 317 F.3d at 1205-06).

The CCA addressed the coerced testimony claim as follows.

## 2. Standard of Review

Because defense counsel did not object to the court's comments to Buchanan's attorney, we review for plain error. [*See Dunlap v. People*, 173 P.3d 1054, 1062 (Colo. 2007)].

## 3. Applicable Law

Due process entitles a defendant to a fair trial, but not a perfect trial. *Medina v. People*, 114 P.3d 845, 856 (Colo. 2005).   To conclude that a defendant has been denied due process, a court must find that the acts complained of are of such quality as to necessarily prevent a fair trial.   [*State v. Filipov*, 576 P.2d 507, 514 (Ariz. Ct. App. 1977)] (citing Lisenba v. California, 314 U.S. 219, 236 (1941)).

A trial court has wide discretion in conducting a trial, but the court must exercise restraint over its conduct and statements to maintain an impartial forum. *People v. Coria*, 937 P.2d 386, 391 (Colo. 1997).   The test is whether the court's conduct departed from the required impartiality to such an extent as to deny the defendant a fair trial.   *Id.*

The limits on a court's power to persuade a reluctant witness to testify are not fully developed in Colorado case law.   A Colorado statute provides that courts may, upon request by the prosecution, grant a witness immunity who had previously refused to testify based on his or her Fifth Amendment privilege against self-incrimination.   § 13-90-118, C.R.S. 2013.   After the grant of immunity, the court may order the immunized witness to testify and the witness may not refuse the court's order.   *Id.*   If the witness refuses to obey the court's order, the court may impose contempt sanctions.   *United States v. Giraldo*, 822 F.2d 205, 209 (2d Cir. 1987) (having granted the witness immunity for his testimony, the court was empowered to order the witness to testify and the witness's refusal to testify constituted contempt of court); *People v. Mulberry*, 919 P.2d 835, 836-37 (Colo. App. 1995) (announcements before the trial court by immunized witnesses that they will not testify as required by the court's order is a direct criminal contempt). Even so, a witness has the right to make a free and voluntary choice whether to testify or refuse to testify and face the consequences of refusal.   *Archer v. State*, 859 A.2d 210, 226 (Md. 2004).

However, improper coercion of a witness by a trial court does not necessarily mean that a defendant against whom the witness testifies can obtain relief regarding his own conviction.   *Giraldo*, 822 F.2d at 211.   Unless there is some prejudice to the defendant, there is no due process basis on which to set aside the conviction.   *Id.*   And the fact that the allegedly coerced witness's testimony is harmful to a defendant is not sufficient prejudice.   *Id.*

62

4. Application

Here, the trial court did not order Buchanan to testify, nor did it tell Buchanan's counsel to inform him that contempt charges were possible.   Instead the court offered its stance on leniency in sentencing because Buchanan had cooperated with the government and briefly mentioned that Buchanan might be able to void the plea agreement and in turn face prosecution for his involvement in the victim's death.

Because the court did not follow the procedures for granting immunity and ordering the witness to testify or face contempt charges under section 13-90-118, we will assume, without deciding, that the court's colloquy on leniency in sentencing for Buchanan was beyond the court's powers to coerce a reluctant witness to testify.

Even so, we conclude that, under the specific circumstances of this case, defendant was not prejudiced by the court's comments and therefore the court's actions did not violate his due process right to a fair trial.

The parties have not cited, nor have we found, any Colorado case law discussing whether the court's comments, directed to a testifying witness and not to the defendant, are problematic.   Defendant relies upon *Crumb v. People*, 230 P.3d 726, 731 (Colo. 2010), in which the supreme court disapproved the trial court's comments suggesting leniency if the defendant agreed to a proposed plea agreement.   That disapproval, however, was predicated on the proposition that a trial judge should not participate in plea discussions between the prosecution and the defendant.   Hence, that case is inapposite here, where the court's comments were not directed to defendant.

Similar cases from other jurisdictions provide some assistance in our analysis.

Some courts have concluded that witnesses who testify against a defendant pursuant to a plea agreement that is predicated on the witness's testimony being consistent with prior statements or prior testimony can violate the defendant's right to a fair trial if the state's case substantially depends on the witness's tainted testimony.   *See, e.g., People v. Medina*, 116 Cal. Rptr. 133, 144-45 (Cal. Ct. App. 1974).   However, it is only where the prosecution has bargained for false or specific testimony, or a specific result, that a witness's testimony is so tainted as to require preclusion in order to satisfy due process.   *People v. Bannister*, 923 N.E.2d 244, 251-52 (Ill. 2009); *State v. Bolden*, 979 S.W.2d 587, 591 (Tenn. 1998).   Thus, where the agreement is predicated on the witness's truthful testimony, courts have found that the testimony does not violate the defendant's rights to due process and a fair trial.   *Bannister*, 923 N.E.2d at 252-53; *People v. Jones*, 600 N.W.2d 652, 657 (Mich. Ct. App. 1999); *Bolden*, 979 S.W.2d at 593.

Here, Buchanan's plea agreement is conditioned upon his giving truthful testimony.   During the direct and cross-examinations of Buchanan, he stated, repeatedly, that he had agreed to testify truthfully in exchange for a plea to attempted second degree murder and a reduced sentence thereon.

To the extent defendant argues that the trial court offered leniency in sentencing based on Buchanan's agreement to testify consistently with his testimony in the Williams and O'Neal trial, we reject the assertion.   As evidenced by the trial court's statements, the court was exclusively interested in influencing Buchanan's choice to testify; there is no mention or implication that his testimony must, or should, conform to his prior testimony at the Williams and O'Neal trial.

If defendant's argument that the trial court predicated its leniency offer on consistent testimony is based on the trial court's reference to Buchanan's cooperation with the government, we reject that argument.   *See Jones*, 600 N.W.2d at 657 (although immunity agreements may provide some incentive for the witnesses to conform their trial testimony to their prior accounts of the incident, they did not violate the defendant's rights where the prosecution expressly conditioned the immunity on the witness's truthful testimony).

In sum, the trial court's influence on Buchanan's testifying did not violate defendant's due process rights based on a consistency provision in the plea agreement, and there was no implication by the court that Buchanan must testify consistently with his previous testimony in order to receive leniency.

There are situations in which an appellate court has found that a trial court's coercion of a reluctant witness's testimony has exceeded the court's power.   *See Giraldo*, 822 F.2d at 211-12; *Archer*, 859 A.2d at 215-28.   However, even if a court exceeds its authority by coercing a witness to testify, there must be prejudice to the defendant; without prejudice, the defendant's due process rights and right to a fair trial are not violated.   *Giraldo*, 822 F.2d at 211-12.

In *Archer*, an accomplice-witness had a plea agreement stipulating that he would receive a life sentence with all but fifteen years suspended in exchange for testifying against his codefendant during his own joint trial, and against *Archer* in a later trial.   *Archer*, 859 A.2d at 215.   Yet, the witness refused to testify at *Archer's* first trial, which resulted in a mistrial.   *Id.* at 216.   Before opening statements in *Archer's* second trial, counsel for the witness informed the court that the witness was again unwilling to testify because he had been stabbed in prison for giving testimony.   *Id.*

In an effort to coerce the witness to testify, the trial court stated:

If he refuses to testify, then I'll immediately have [witness's counsel] and [the witness] taken before Judge Themelis. . . . [A]nd we'll try him for contempt. . . . Judge Themelis will give him the

longest possible sentence the law allows him to give and then maybe
he'll change his mind about refusing to testify.

*Id.*   The trial court explained that there was no statutory maximum sentence for
contempt, and theoretically, the witness could receive a life sentence.   *Id.* at 217.

The witness continued to refuse and the trial court, in open court in the
presence of the witness, called Judge Themelis and asked him to interrupt his
schedule to try a contempt case, and instructed Judge Themelis how to rearrange
his schedule to accommodate the contempt trial.   *Id.*

The *Archer* trial court then advised the witness that if he testified favorably
to the defendant, the government would have no recourse against him and the
prosecution could then cross-examine him about anything unfavorable he had said
in the past; the court presented this as a situation where "the defendant benefits and
the State benefits."   *Id.* at 218.   The court advised, "So, he may want to do that
rather than run the risk of getting a life sentence from Judge Themelis."   *Id.*

The prosecutor objected on the grounds that the trial court was attempting
to coach the witness and that this advice was not proper coming from the bench.
Defense counsel also objected.

On appeal, the Maryland Court of Appeals agreed with the objectors,
concluding:

> [The witness] had a right to make a free and voluntary
> choice whether or not to testify. He had the right to choose, free
> from judicial intimidation and improper advisements, whether to
> testify or face the consequences of his failure to testify.   The
> difference here is that the trial judge's admonition and conduct was
> so excessive that it likely caused [the witness] to alter testimony in
> violation of [the defendant]'s right to due process.

*Id.* at 226 (emphasis added).

In contrast, in *Giraldo*, the court concluded that, although the trial court's
actions were improper, there was no violation of due process.   *Giraldo*, 822 F.2d at
211.   The defendant in *Giraldo* asserted that a witness against him at trial was so
tainted by the court's coercive actions that he was entitled to postconviction relief.
*Id.* at 209.   At trial, the witness had refused to testify and as a result, the trial court
sentenced the witness to forty years in prison, the maximum allowable sentence,
immediately after the witness refused to testify; sentenced him to six months
incarceration for civil contempt; sentenced him after seeking and obtaining a
waiver of a presentence report; sentenced him to an incarceration facility over
1,000 miles from the witness's home; recommended that he be ineligible for parole;
and ordered him to be transported to the distant prison that same week.   *Id.* at 211.

However, after the witness changed his mind and testified, the court reduced the forty-year sentence to four years and withdrew the recommendations for incarceration at a remote distance and parole ineligibility.  *Id.*

The appellate court concluded that the trial court improperly used its forty-year sentence to coerce the witness to testify.  *Id.*  However, the court concluded that "unless [the court] see[s] some prejudice to defendant, there is no basis on which to set aside the defendant's' conviction."  *Id.*  The court held that, under the circumstances, the defendant had suffered no prejudice because the witness testified consistently with statements he had made in his plea allocution and those statements inculpated the defendant.  *Id.*  Any statements that the witness had recanted did not relate to the defendant's involvement.  *Id.*  "Thus, it does not appear that the coercion in any way caused [the witness] to express a view of *Giraldo's* role that he had ever contradicted."  *Id.*

Here, even if we were to conclude that the trial court's actions were as egregious as those in *Archer* and *Giraldo*, a determination we do not make, the situation is more analogous to *Giraldo* because Buchanan did not change his testimony in defendant's trial after the asserted acts of judicial coercion. Buchanan testified consistently with his post-plea agreement statements and with his testimony at the Williams and O'Neal trial.   Defense counsel was on notice of the content of Buchanan's testimony both through the statements Buchanan had made to the police and prosecutor's office and because defense counsel attended the Williams and O'Neal trial.   Buchanan also was thoroughly cross-examined regarding his motives for testifying and was impeached repeatedly with inconsistent statements that he had given to the police.

The *Giraldo* court also based its decision on the fact that the jury was informed that the witness had once had a plea agreement with the prosecution, but was testifying now without the agreement and with the hope that the court would reduce his forty-and-one-half-year sentence.  *Id.*  Here, the jury was not informed that Buchanan was testifying in the hope of receiving a lenient sentence within the boundaries of his plea agreement with the prosecution.

Even so, we conclude that withholding such information from the jury was not critical because it was informed that Buchanan had entered into a plea agreement, it heard the terms of that plea agreement, and it heard Buchanan's motive and biases in testifying.   The potential additional information that Buchanan agreed to testify in this trial in hopes of being sentenced in the lower end of his sentencing range was cumulative of other motive and bias evidence.

Therefore, defendant was not prejudiced by the trial court's actions because, similar to the witness in *Giraldo*, Buchanan did not alter his testimony at defendant's trial from his post-plea statements or from his testimony at the Williams and O'Neal trial, defense counsel had ample notice of the content of Buchanan's testimony, the jury was informed that Buchanan was testifying

pursuant to a plea agreement, and Buchanan was cross-examined on his credibility and motive for testifying.

To the extent defendant asserts he was prejudiced by the fact that the court persuaded Buchanan to testify when he otherwise would not have, we conclude that defendant, who has the burden of proof concerning prejudice and plain error, has failed to prove that assertion. *See Giraldo*, 822 F.2d at 211-12 (harmful testimony without more is not enough to show prejudice). It appears to be equally likely that Buchanan was simply seeking an additional advantage from the court before testifying, but that if he had not received any assurances of leniency in sentencing, he would nevertheless have testified, given his understanding that the prosecution would bring him to trial for first degree murder if he were to refuse to testify. In addition, defendant did not present an affidavit or testimony from Buchanan that, but for the court's promise of leniency, he would not have testified.

We therefore perceive no plain error.

*Mingo*, No. 10CA2150 at 36-48; ECF No. 10-3 at 37-49.

The CCA conducted a plain-error review based on whether Applicant was prejudiced by the fact that the trial court persuaded Mr. Buchanan to testify. Relying on *Giraldo*, the CCA found that unless there is some prejudice to the defendant, there is no due process basis on which to set aside the conviction and the fact that the allegedly coerced witness's testimony is harmful to a defendant is not sufficient prejudice. The CCA concluded that, under the specific circumstances of this case, defendant was not prejudiced by the court's comments and therefore the court's actions did not violate his due process right to a fair trial. This Court, therefore, determines that there is no independent state ground of decision and, thus, no basis for procedural bar. *See Cargle*, 317 F.3d at 1206. Because the CCA's disposition was a form of merits review, the state court's disposition would be entitled to § 2254(d) deference. *Id.* The Court finds that Claim Three is exhausted and will address this claim below on the merits.

The following proceedings took place in chambers between the trial court judge, the defense attorney, the prosecutor, and the attorney for Mr. Buchanan. The proceeding pertained to Mr. Buchanan's anticipated refusal to testify. The colloquy is as follows.

67

THE COURT: We're joined now in chambers by the three attorneys involved in this case as well as counsel for Mr. Buchanan.   You requested a meeting with the Court?

MR. BRIMMER: Your Honor, the reasons we requested a meeting with the Court is because we have learned through counsel for Christopher Buchanan that he is going to refuse to testify.

Apparently the grounds that he is going to refuse to testify on are that he doesn't think that the plea bargain that he entered into is fair anymore in light of the verdicts in the trial of Williams and O'Neal.   And given that fact, I think we need to take up some issues before we would call Mr. Buchanan.

Specifically, some of the issues that are raised are ones that are discussed in the opinion of *People v. Newton*, which Mr. Robbins has which is 966 p2d 563, Colorado Supreme Court 1998; those issues dealing with whether Mr. Buchanan would persist in invoking the right to the Fifth Amendment despite the fact that he has been granted immunity.

We do intend to grant Mr. Buchanan immunity, but if he persists in refusing to honor his agreement--his agreement being to testify truthfully in the trials of the co-defendants--he would be violating that agreement, and our intention would be to prosecute him sometime in the future.   But if the deal's off, then--we granted him immunity for purposes of this trial, but if he refuses to testify, that raises issues which are discussed in *Newton* about whether the People would even have the ability to call him to the stand.

And the other issue that's raised is whether his refusal to testify would thereby make him unavailable under Rule 804.

THE COURT: Well, if he has prosecution pending and he takes his Fifth Amendment rights--and that may be the case--and if he doesn't feel the obligation and People intend to prosecute him, there's no question he's not available, is there? That's the classic unavailability other than death.

MR. BRIMMER: Yeah.

THE COURT: Let me offer--the reason I asked you to come over too, since you represent your client, the Court's aware that Mr. O'Neal – and who's the other defendant?

MR. BRIMMER: Brett Williams.

THE COURT: Mr. Williams fared better in their trial or were convicted of offenses less serious than Mr. Buchanan pled to.   Nevertheless, there is some latitude in that agreement that Mr. Buchanan struck with the People.

It's, you know, I haven't seen all the relevant factors.   I haven't seen a report on any of the individuals involved as yet, but that certainly is a significant factor that one of the defendants may be cooperating with the other one.   And there's, you know, a significant concern that those who did not cooperate maybe doing better in the long run than those who did cooperate, and the Court is keenly aware of that and appreciates why he may feel like got the raw end of the stick at this point.

So convey those thoughts to him for whatever it's worth.   Since I delayed sentencing on this case until all the evidence is in, I haven't heard any evidence so far that would indicate that Mr. Buchanan's degree of involvement was any more severe that the other individual's.   As a matter of fact, the--and that's another factor the Court will consider seriously.

So you and your client can decide what you want to do given the turn of events in this case.   He should at least understand that this judge appreciates the situation he finds himself in and will take it into consideration, give it very serious consideration, but –

MS. TAFOYA: I'll relay that to Mr. Buchanan.   There is also a concern though of his which is his safety.

THE COURT: I appreciate that.

MS. TAFOYA: And that concerns him as well.

THE COURT: That's been in existence all the time.

MS. TAFOYA: So even though he is aware of the plea agreement or the verdicts in the other cases, his safety has been another issue.

THE COURT: This agreement hasn't been completed and I suppose if he wants to renege or back out of the deal, he still has an opportunity to do that.   In such case, he would come back in here and schedule trial on the merits.

*Mingo*, Case No. 98CR2673, Feb. 10, 1999 Trial Tr. at 27-30.

The Court does not find that at the time Applicant was convicted and sentenced there was a

United States Supreme Court holding on point with Applicant's claim that the trial court violated

his due process rights by stating to a witness's attorney that he would take into consideration at the

time of a witness's sentencing his willingness to testify at a co-defendant's trial.   *Williams*, 529

U.S. at 412 (must be a rule of law clearly established by the Supreme Court at the time a defendant's conviction became final).

It, however, is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the United States Court.   *See Richter*, 562 U.S. at 101.   Furthermore, the more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.   *Id.*

Under general established due process law, it is well established that the denial of due process in a state criminal trial "is the failure to observe that fundamental fairness essential to the very concept of justice."   *Lisenba v. State of Cal.*, 314 U.S. 219, 236 (1941).   In order to declare a denial of due process, the Court must find that "the absence of that fairness fatally infected the trial."   *Id.*; *see also Tapia v. Tansy*, 926 F.2d 1554, 1557 (10th Cir. 1991) (due process claims entitle applicant to relief only if the alleged errors rendered the trial as a whole fundamentally unfair).

The trial court's indication that it would consider Mr. Buchanan's testimony at Applicant's trial when the court sentenced him does not render Applicant's trial as fundamentally unfair.

First, as found by the CCA, Mr. Buchanan's attorney was not told that Applicant would be subject to contempt charges if he elected not to testify at Applicant's trial; he was only informed of the trial court's stance on leniency.   Mr. Buchanan's testimony was the same as his testimony at Messrs. Williams and O'Neal trial, and, finally, the jury was informed that Mr. Buchanan was testifying pursuant to a plea agreement and heard the cross-examination on his credibility and motive for testifying.   The Court, therefore, finds that Mr. Buchanan's testimony did not fatally infect the trial so that it rendered the trial as a whole fundamentally unfair.

The Court presumes that the CCA's factual determinations are correct. *See Sumner*, 455 U.S. at 592-93. Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet this burden.

Accordingly, the CCA's decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Claim Three will be dismissed on the merits.

### C.  Claim Four/Unknowing, Involuntary, or Unintelligent Waiver of Right to Testify

Applicant asserts he was young at the time of the trial in this case and did not know he had the right to overrule his attorney's decision that he not testify. ECF No. 1 at 20. Applicant further asserts that the trial judge gave him an incomplete and inaccurate advisement about his right to testify before he waived the right. *Id.* at 20. In particular, Applicant contends that the trial judge only discussed the disadvantages of testifying during the advisement and did not tell him that the jury would be instructed they could not consider another felony conviction as proof of his guilt in the murder trial and that they could not consider his decision not to testify. *Id.* at 22. Finally, Applicant contends that the judge did not ask him his decision, he failed to confirm Applicant's decision on the record, and he failed to inquire if his decision to waive his right was made knowingly, intelligently, and voluntarily. *Id.*

In his Reply, Applicant further asserts that if his trial attorney was still living he would testify and concede Applicant did not understand he had the right to overrule the trial attorney's decision that Applicant would not testify.   ECF No. 37 at 16.

Under Colorado law, a trial court is required to advise a defendant of the right to testify and obtain a formal waiver of that right.   *People v. Curtis*, 681 P.2d 504 (Colo. 1984).   In adopting this heightened requirement of advisement, the Colorado Supreme Court acknowledged that a majority of courts addressing the issue have not required that a waiver of the right to testify be made on the record in open court.   *Curtis*, 681 P.2d at 512 n.9.

The Tenth Circuit Court of Appeals has held that there is no constitutional or statutory mandate that a trial court inquire into a defendant's decision not to testify in the absence of specific circumstances that might trigger an inquiry.   *United States v. Janoe*, 720 F.2d 1156, 1161 (10th Cir. 1983) (specifically rejecting a defendant's contention that the "record [must be] clear that defendant knowingly and voluntarily 'after full consultation with his counsel,' gave up the right to testify").   The Tenth Circuit later reaffirmed and clarified its holding in *Janoe*, concluding that the trial court does not have a *sua sponte* duty to conduct a colloquy with the defendant at trial to determine whether the defendant has knowingly and intelligently waived the right to testify, and that absent triggering circumstances, a trial court is not required to inquire into the defendant's decision not to testify.   *United States v. Dryden*, 141 F.3d 1186 at *1-2 (10th Cir. Mar. 10, 1998) (unpublished) (citations omitted), *vacated in part on reh'g on other grounds*, 166 F.3d 1222 (10th Cir. Apr. 22, 1998).

The trial court told Applicant that "[w]hile it's appropriate that you should talk to your attorney about [testifying] and get the benefit of your attorney's advice, it's your decision ultimately" and the important thing is to "understand that it's your--your choice, not your

attorney's choice."   Case No. 98CR2673, Feb. 10, 1999 Trial Tr. at 244-45.   The trial court

further told Applicant that it was his choice whether to take the stand or not and if his attorney says

the defense rests without calling Applicant the court would be correct in assuming it was

Applicant's choice not to testify.   *Id.* at 245.   Nothing in the transcript demonstrates that the trial

court violated Applicant's constitutional rights in the colloquy that took place regarding

Applicant's decision to testify or to not testify.

The Court presumes that the CCA's factual determinations are correct.   *See Sumner*, 455

U.S. at 592-93.   Applicant bears the burden of rebutting the presumption by clear and convincing

evidence, *see Houchin*, 107 F.3d at 1470, which for the reasons stated above he has failed to meet

this burden.

Accordingly, the CCA's decision did not result in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States; or result in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.   Claim

Four will be dismissed on the merits.

### III.   CONCLUSION

Based on the above findings, Applicant's claims lack merit and the 28 U.S.C. § 2254

Application must be dismissed.

### IV.   ORDERS

Accordingly, it

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C.

§ 2254, ECF No. 1, is DISMISSED WITH PREJUDICE.   It is

FURTHER ORDERED that a certificate of appealability shall not issue because Applicant has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c).   It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied.   The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order is not taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of appeal.   *See Coppedge v. United States*, 369 U.S. 438 (1962).   If Applicant files a notice of appeal he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

DATED March 8, 2016.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge